## Case No. 16,317.

UNITED STATES v. SMILEY et al.

[6 Sawy. 640.] [1]

Circuit Court, N. D. California. Sept. 5, 1864.

THEFT OF ABANDONED PROPERTY — EXTRATERRITORIAL CRIMINAL JURISDICTION—PROPERTY BURIED IN SEA.

1. The ninth section of the act of congress of March 3, 1825 [4 Stat. 116], against plundering or stealing money, goods, merchandise or other effects from or belonging to any ship or vessel, in distress or wrecked, lost or stranded, does not apply to property which has been abandoned by its owners. Property thus abandoned may be acquired by any one who has the energy and enterprise to seek its recovery, without violating the statute.

2. The criminal jurisdiction of the United States may, in some instances, extend to their citizens beyond their territory, as, for instance, for violation of treaty stipulations by them abroad; for offenses committed in foreign countries where jurisdiction is by treaty conceded for that purpose, as in some cases in China and the Barbary States; for offenses committed on deserted islands or uninhabited coasts, by officers and seamen of vessels sailing under their flag; and for derelictions of duty by their ministers, consuls and other representatives abroad. But except in cases like these (and their extraterritorial character is generally indicated in the law designating the act for which punishment is prescribed), the criminal jurisdiction of the United States is limited to their own territory, actual or constructive. Their actual territory is co-extensive with their possessions, including a marine league from their shores on the sea. Their constructive territory embraces vessels sailing under their flag. Wherever they go they carry the laws of their country, and for a violation of them their officers and seamen may be subjected to punishment.

[Cited in Com. v. Manchester, 152 Mass. 245, 25 N. E. 118; Manchester v. Massachusetts, 139 U. S. 262, 11 Sup. Ct. 564.]

3. In this case the vessel, which carried the money recovered by the accused, was at the time of its recovery broken up, without a vestige of it remaining. The money was buried in the sand several feet under the water of the sea and was within one hundred and fifty feet of the Mexican shore. Held, that there was no jurisdiction of the United States over the place or property; and that the jurisdiction of Mexico over all offenses committed within a marine league of its shores, not on a vessel of another nation, was complete and exclusive.

[This was an indictment against Thomas J. L. Smiley and others for plundering and stealing property from a wreck, under the act of congress of May 3, 1825. Heard on demurrer.]

The case was as follows: The steamer Golden Gate, belonging to the Pacific Mail Steamship Company, left San Francisco for Panama on the twenty-first of July, 1862, with two hundred and forty-two passengers and a crew of ninety-six persons. At about five o'clock on the afternoon of Sunday, July 27th, while running within three and a half miles of the Mexican coast, she was discovered to be on fire. An examination disclosed that the fire had originated between one of

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

the galleys and the smokestack, and it soon became apparent that it was impossible to save her. She was then immediately headed for the shore, and half an hour later struck on a shelving beach of sand about two hundred and fifty feet from the shore, at a point fifteen miles north of the port of Manzanillo. The surf, which was breaking heavily, soon swung her stern around so that she lay nearly parallel with the beach when she went to pieces. At eight o'clock of that evening all that remained visible were her engines, boilers, and wheel frames. Of the three hundred and thirty-eight souls on board, only one hundred and forty were saved. The treasure which she carried, amounting to one million four hundred and fifty thousand dollars, was sunk about forty feet inside of the wreck, where in a space of sixty feet square upwards of one million two hundred thousand dollars were subsequently recovered.

Soon after the loss of the steamer was known, a vessel was fitted out by the underwriters to proceed to the scene of disaster and recover whatever was possible of the treasure. The parties employed soon returned and abandoned the idea of finding it. Immediately another vessel, the Active, was sent by a party of capitalists on the same errand, but she returned likewise unsuccessful. In December, 1862, another party of capitalists started another vessel, the schooner William Ireland, fitted with pumps and wrecking appliances and accompanied by submarine divers, under the command of Ireland, one of the projectors of the enterprise. The men in this expedition succeeded in recovering eight hundred thousand dollars. In August, 1863, they again returned to the wreck and were successful in recovering seventy-six thousand dollars more, when it was believed that any further efforts to secure any additional amount would be unsuccessful. Afterwards, in September, 1863, Thomas J. L. Smiley and others fitted out another expedition with a party of divers and a more complete equipment of diving and wrecking apparatus, and returned in January following, having succeeded in recovering three hundred and three thousand dollars. On a second trip they found thirty-three thousand dollars more; and with that voyage all efforts in that direction were closed. The treasure recovered by Smiley and others was carried in wooden boxes, each containing from five hundred dollars to forty-four thousand dollars, and was stowed in a room near the stern of the ship. The locality where the greater part was found was about one hundred and fifty feet from the shore of Mexico, and in from six to nine feet of water. Beneath the water was an equal depth of sand, under which was a hard clay stratum. On this hardpan beneath the water and the sand, the treasure boxes lay.

Before commencing his operations, Smiley had obtained from the Mexican government a license to explore for the treasure lost. On his return to San Francisco, claim was made by shippers for the specie recovered, but it was not given up, as the parties could not agree as to the amount which the recovering party should retain as compensation for the recovery. The result was that a complaint was made against Smiley and others of his company, and in March, 1864, they were indicted in the circuit court of the United States for plundering and stealing the treasure from the Golden Gate, under the ninth section of the act of congress of March 3, 1825, which provides "that, if any person or persons shall plunder, steal, or destroy any money, goods, merchandise or other effects, from or belonging to any ship, or vessel, or boat or raft, which shall be in distress, or which shall be wrecked, lost, stranded, or cast away upon the sea, or upon any reef, shoal, bank, or rocks of the sea, or in any other place within the admiralty and maritime jurisdiction of the United States," he "shall be deemed *guilty of felony, and shall, on conviction thereof, be punished by fine, not exceeding five thousand dollars, and imprisonment and confinement to hard labor not exceeding ten years, according to the aggravation of the offense.*" 4 Stat. 116.

To the indictment a demurrer was interposed on various technical grounds. As the expedition conducted by Smiley was an open one, after all other efforts for the recovery of the treasure had been abandoned, and Smiley was a man of previously good character and standing in the community, the indictment was generally regarded as persecution,—as an attempt to coerce the treasure from him without allowing proper compensation to him and his associates for its recovery. The counsel engaged in the case appeared to recognize this. It was therefore agreed that the facts stated above should be deemed admitted, and that upon them the following questions should be presented to the court for determination: First, whether the act of congress applied to a case where the taking of the property, of which larceny was alleged, was after the vessel had gone to pieces and disappeared; and, second, whether, if the act covered such a case, the circuit court had jurisdiction to try the offense charged, it having been committed within a marine league of the shores of Mexico; with a stipulation that if the court should be of opinion that the act did not apply to the case, or that it had not jurisdiction to try the offense charged, the demurrer should be sustained. Upon this stipulation the questions were argued.

William Barber, for the prosecution.

John B. Felton and Delos Lake, for defendants.

Before FIELD, Circuit Justice, and HOFFMAN, District Judge.

FIELD, Circuit Justice. We are not prepared to decide that the statute does not apply to a case where the vessel has gone to

pieces, to which the goods belonged, of which larceny is alleged. It would fail of one of its objects if it did not extend to goods which the officers and men of a stranded or wrecked vessel had succeeded in getting ashore, so long as a claim is made by them to the property, though before its removal the vessel may have been broken up. We are inclined to the conclusion that, until the goods are removed from the place where landed, or thrown ashore, from the stranded or wrecked vessel, or cease to be under the charge of the officers or other parties interested, the act would apply if a larceny of them were committed, even though the vessel may in the meantime have gone entirely to pieces and disappeared from the sea. But in this case the treasure taken had ceased to be under the charge of the officers of the Golden Gate, or of its underwriters, when the expedition of Smiley was fitted out, and all efforts to recover the property had been given up by them. The treasure was then in the situation of derelict or abandoned property, which could be acquired by any one who might have the energy and enterprise to seek its recovery. In our judgment the act was no more intended to reach cases where property thus abandoned is recovered, than to reach property voluntarily thrown into the sea, and afterwards fished from its depths.

But if the act covered a case where the property was recovered after its abandonment by the officers of the vessel and others interested in it, we are clear that the circuit court has not jurisdiction of the offense here charged. The treasure recovered was buried in the sand, several feet under the water, and was within one hundred and fifty feet from the shore of Mexico. The jurisdiction of that country over all offences committed within a marine league of its shore, not on a vessel of another nation, was complete and exclusive.

Wheaton, in his treatise on International Law, after observing that "the maritime territory of every state extends to the ports, harbors, bays, and mouths of rivers and adjacent parts of the sea inclosed by headlands, belonging to the same state," says: "The general usage of nations superadds to this extent of territorial jurisdiction a distance of a marine league, or as far as a cannon-shot will reach from the shore, along all the coasts of the state. Within these limits its rights of property and territorial jurisdiction are absolute, and exclude those of every other nation." Part 2, c. 4, § 6.

The criminal jurisdiction of the government of the United States—that is, its jurisdiction to try parties for offenses committed against its laws—may in some instances extend to its citizens everywhere. Thus, it may punish for violation of treaty stipulations by its citizens abroad, for offenses committed in foreign countries where, by treaty, jurisdiction is conceded for that purpose, as in some cases in China and in the Barbary States; it may provide for offences committed on deserted is-

lands, and on an uninhabited coast, by the officers and seamen of vessels sailing under its flag. It may also punish derelictions of duty by its ministers or consuls, and other representatives abroad. But in all such cases it will be found that the law of congress indicates clearly the extraterritorial character of the act at which punishment is aimed. Except in cases like these, the criminal jurisdiction of the United States is necessarily limited to their own territory, actual or constructive. Their actual territory is co-extensive with their possessions, including a marine league from their shores into the sea.

This limitation of a marine league was adopted because it was formerly supposed that a cannon-shot would only reach to that extent. It is essential that the absolute domain of a country should extend into the sea so far as necessary for the protection of its inhabitants against injury from combating belligerents while the country itself is neutral. Since the great improvement of modern times in ordnance, the distance of a marine league, which is a little short of three English miles, may, perhaps, have to be extended so as to equal the reach of the projecting power of modern artillery. The constructive territory of the United States embraces vessels sailing under their flag; wherever they go they carry the laws of their country, and for a violation of them their officers and men may be subjected to punishment. But when a vessel is destroyed, and goes to the bottom, the jurisdiction of the country over it necessarily ends, as much so as it would over an island which should sink into the sea.

In this case it appears that the Golden Gate was broken up; not a vestige of the vessel remained. Whatever was afterwards done with reference to property once on board of her, which had disappeared under the sea, was done out of the jurisdiction of the United States, as completely as though the steamer had never existed.

We are of opinion, therefore, that the circuit court has no jurisdiction to try the offense charged, even if, under the facts admitted by the parties, any offense was committed. According to the stipulation, judgment sustaining the demurrer will be, therefore, entered, and the defendants discharged.