## UNITED STATES v. BOWMAN.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 69. Argued October 17, 1922.—Decided November 13, 1922.

1. A criminal statute dealing with acts that are directly injurious to the Government and are capable of perpetration without regard to particular locality, and subjecting all who commit them to punishment, is to be construed as applicable to citizens of the United States upon the high seas or in a foreign country, though there be no express declaration to that effect. P. 97.

2. Section 35 of the Criminal Code, as amended October 23, 1918, c. 194, 40 Stat. 1015, is applicable to citizens of the United States who, on the high seas, or in a foreign country, conspired to defraud the United States Shipping Board Emergency Fleet Corporation, of which the United States was the stockholder, by obtaining and aiding to obtain the allowance and payment of a false and fraudulent claim against the Corporation, and who, in a foreign country, made and caused such claim to be made. P. 100.

3. Penal statutes should be fairly construed, according to the legislative intent. P. 102.

4. Citizens of the United States while in a foreign country are subject to penal laws passed by the United States to protect itself and its property; and for infractions abroad are triable, under Jud. Code, § 41, in the district where they are first brought. P. 102.

287 Fed. 588, reversed.

ERROR to a judgment of the District Court quashing an indictment on demurrer.

*Mr. Solicitor General Beck* with whom *Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, was on the brief, for the United States.

No appearance for defendant in error.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a writ of error under the Criminal Appeals Act (c. 2564, 34 Stat. 1246) to review the ruling of the District Court sustaining a demurrer of one of the defendants to an indictment for a conspiracy to defraud a corporation in which the United States was and is a stockholder, under § 35 of the Criminal Code, as amended October 23, 1918, c. 194, 40 Stat. 1015.

During the period covered by the indictment, i. e., between October, 1919, and January, 1920, the steamship Dio belonged to the United States. The United States owned all the stock in the United States Shipping Board Emergency Fleet Corporation. The National Shipping Corporation agreed to operate and manage the Dio for the Fleet Corporation, which under the contract was to pay for fuel, oil, labor and material used in the operation. The Dio was on a voyage to Rio de Janeiro under this management. Wry was her master, Bowman was her engineer, Hawkinson was the agent of the Standard Oil Company at Rio de Janeiro, and Millar was a merchant and ship repairer and engineer in Rio. Of these four, who were the defendants in the indictment, the first three were American citizens, and Millar was a British subject. Johnston & Company were the agents of the National Shipping Corporation at Rio. The indictment charged that the plot was hatched by Wry and Bowman on board the Dio before she reached Rio. Their plan was to order, through Johnston & Company, and receipt for, 1000 tons of fuel oil from the Standard Oil Company, but to take only 600 tons aboard, and to collect cash for a delivery of 1000 tons through Johnston & Company, from the Fleet Corporation, and then divide the money paid for the undelivered 400 tons among the four defendants. This

plan was to be, and was, made possible through the guilty connivance of the Standard Oil agent Hawkinson and Millar the Rio merchant who was to, and did collect the money. Overt acts charged included a wireless telegram to the agents, Johnston & Company, from the Dio while on the high seas ordering the 1000 tons of oil. The Southern District of New York was the district into which the American defendants were first brought and were found, but Millar, the British defendant, has not been found.

The first count charged a conspiracy by the defendants to defraud the Fleet Corporation in which the United States was a stockholder, by obtaining and aiding to obtain the payment and allowance of a false and fraudulent claim against the Fleet Corporation. It laid the offense on the high seas, out of the jurisdiction of any particular State and out of the jurisdiction of any district of the United States, but within the admiralty and maritime jurisdiction of the United States. The second count laid the conspiracy on the Dio on the high seas and at the port of Rio de Janeiro as well as in the city. The third count laid it in the city of Rio de Janeiro. The fourth count was for making and causing to be made in the name of the Standard Oil Company, for payment and approval, a false and fraudulent claim against the Fleet Corporation in the form of an invoice for 1000 tons of fuel oil, of which 400 tons were not delivered. This count laid the same crime on board the Dio in the harbor of Rio de Janeiro. The fifth count laid it in the city and the sixth at the port and in the city.

No objection was made to the indictment or any count of it for lack of precision or fullness in describing all the elements of the crimes denounced in § 35 of the Criminal Code as amended. The sole objection was that the crime was committed without the jurisdiction of the United States or of any State thereof and on the high seas or

within the jurisdiction of Brazil. The District Court considered only the first count, which charged the conspiracy to have been committed on the Dio on the high seas, and having held that bad for lack of jurisdiction, *a fortiori* it sustained the demurrer as to the others.

The court in its opinion conceded that under many authorities the United States as a sovereign may regulate the ships under its flag and the conduct of its citizens while on those ships, and cited to this point *Crapo* v. *Kelly,* 16 Wall. 610, 623–632; *United States* v. *Rodgers,* 150 U. S. 249, 260–1, 264–5; *The Hamilton,* 207 U. S. 398, 403, 405; *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347; *Wilson* v. *McNamee,* 102 U. S. 572, 574; *United States* v. *Smiley,* 6 Sawy. 640, 645. The court said, however, that while private and public ships of the United States on the high seas were constructively a part of the territory of the United States, indeed peculiarly so as distinguished from that of the States, Congress had always expressly indicated it when it intended that its laws should be operative on the high seas. The court concluded that because jurisdiction of criminal offenses must be conferred upon United States courts and could not be inferred, and because § 35, like all the other sections of c. 4, contains no reference to the high seas as a part of the *locus* of the offenses defined by it, as the sections in cc. 11 and 12 of the Criminal Code do, § 35 must be construed not to extend to acts committed on the high seas. It confirmed its conclusion by the statement that § 35 had never been invoked to punish offenses denounced if committed on the high seas or in a foreign country.

We have in this case a question of statutory construction. The necessary *locus,* when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a

government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds, which affect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard. We have an example of this in the attempted application of the prohibitions of the Anti-Trust Law to acts done by citizens of the United States against other such citizens in a foreign country. *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347. That was a civil case, but as the statute is criminal as well as civil, it presents an analogy.

But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. Some such offenses can only be committed within the territorial jurisdiction of the Government because of the local acts required to constitute them. Others are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the *locus* shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense. Many of these occur in c. 4, which bears the title "Offenses

against the operations of the Government." · Section 70. of that chapter punishes whoever as consul knowingly certifies a false invoice. Clearly the *locus* of this crime as intended by Congress·is in a foreign country and certainly the foreign country in which he .discharges his official duty could not object to the trial in a United States court of a United States consul for crime of this sort committed within its borders. Forging or altering ship's papers is made a crime by § 72 of c. 4. It would be going too far to say that because Congress does not fix any *locus* it intended to exclude the high seas in respect of this crime. The natural inference from the character of the offense is that the sea would be a probable place for its commission. Section 42 of c. 4 punishes enticing desertions from the naval service. Is it possible that· Congress did not intend by this to include such enticing done aboard ship on the high seas or in a foreign port, where it would be most likely to be done? Section 39 punishes bribing a United States officer of the civil, military or naval service to violate his duty or to aid in committing a fraud on the United States. It is hardly reasonable to construe this not to include such offenses when the bribe is offered to a consul, ambassador, an army or a naval officer in a foreign country or on the high seas, whose duties are being performed there and when his connivance at such fraud must occur there. So, too, § 38 of c. 4 punishes the wilfully doing or aiding to do any act relating to the bringing in, custody, sale or other disposi-, tion of property captured as prize, with intent to defraud, delay or injure the United States or any captor or claimant of such property. This would naturally often occur at sea, and Congress could not have meant to confine. it to the land of the United States. Again, in § 36 of c. 4, it is made a crime to steal, embezzle, or knowingly apply to his own use ordnance, arms, ammunition, clothing, subsistence, stores, money or other property of the United

States furnished or to be used for military or naval service. It would hardly be reasonable to hold that if any one, certainly if a citizen of the United States, were to steal or embezzle such property which may properly and lawfully be in the custody of army or naval officers either in foreign countries, in foreign ports or on the high seas, it would not be in such places an offense which Congress intended to punish by this section.

What is true of these sections in this regard is true of § 35, under which this indictment was drawn. We give it in full in the margin.[1]

---

[1] Section 35 of the Criminal Code, as amended October 23, 1918, c. 194, 40 Stat. 1015, is as follows:

Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, or for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry; or whoever shall take and carry away or take for his own use, or for the use of another, with intent to steal or purloin, any personal property of the United States, or any branch or department thereof, or any corporation in which the United States of America is a stockholder; or whoever shall enter into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, by

It is directed generally against whoever presents a false claim against the United States, knowing it to be such, to any officer of the civil, military or naval service or to any department thereof, or any corporation in which the United States is a stockholder, or whoever connives at the same by the use of any cheating device, or whoever enters a conspiracy to do these things.  The section was amended in 1918 to include a corporation in which the United States owns stock.  This was evidently intended to protect the Emergency Fleet Corporation in which the

---

obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim; and whoever, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, with intent to defraud the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, or willfully to conceal such money or other property, shall deliver or cause to be delivered to any person having authority to receive the same any amount of such money or other property less than that for which he received a certificate or took a receipt; or whoever, being authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, shall make or deliver the same to any other person without a full knowledge of the truth of the facts stated therein and with intent to defraud the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.  And whoever shall purchase, or receive in pledge, from any person any arms, equipment, ammunition, clothing, military stores, or other property furnished by the United States, under a clothing allowance or otherwise, to any soldier, sailor, officer, cadet, or midshipman in the military or naval service of the United States or of the National Guard or Naval Militia, or to any person accompanying, serving, or retained with the land or naval forces and subject to military or naval law, having knowledge or reason to believe that the property has been taken from the possession of the United States or furnished by the United States under such allowance, shall be fined not more than $500 or imprisoned not more than two years, or both.

United States was the sole stockholder, from fraud of this character. That Corporation was expected to engage in, and did engage in, a most extensive ocean transportation business and its ships were seen in every great port of the world open during the war. The same section of the statute protects the arms, ammunition, stores and property of the army and navy from fraudulent devices of a similar character. We can not suppose that when Congress enacted the statute or amended it, it did not have in mind that a wide field for such frauds upon the Government was in private and public vessels of the United States on the high seas and in foreign ports and beyond the land jurisdiction of the United States, and therefore intend to include them in the section.

Nor can the much quoted rule that criminal statutes are to be strictly construed avail. As said in *United States* v. *Lacher,* 134 U. S. 624, 629, quoting with approval from Sedgwick, Statutory and Constitutional Law, 2d ed., 282: " penal provisions, like all others, are to be fairly construed according to the legislative intent as expressed in the enactment." They are not to be strained either way. It needs no forced construction to interpret § 35 as we have done.

Section 41 of the Judicial Code provides that " the trial of all offenses committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought." The three defendants who were found in New York were citizens of the United States and were certainly subject to such laws as it might pass to protect itself and its property. Clearly it is no offense to the dignity or right of sovereignty of Brazil to hold them for this crime against the government to which they owe allegiance. The other defendant is a subject of Great Britain. He has never been apprehended, and it will be time enough to consider what, if any, jurisdiction the Dis-

trict Court below has to punish him when he is brought to trial.

The judgment of the District Court is reversed, with directions to overrule the demurrer and for further proceedings.

*Reversed.*