**UNITED STATES v. GILLILAND et al.**

.Cr. No. 4394.

District Court, E. D. Texas, Tyler Division.

Feb. 20, 1940.

Steve M. King, U. S. Atty., of Beaumont, Tex., for Eastern District of Texas, O. John Rogge, Asst. Atty. Gen., and Welly K. Hopkins, Walter E. Gallagher, and Ben F. Foster, Sp. Assts. to Atty. Gen., for plaintiff.

F. W. Fischer, of Tyler, Tex., for defendants.

DAWKINS, District Judge.

The indictment in this case consists of eleven counts. The first charges a conspiracy, as the Government contends, to

violate Section 80 of Tit. 18 of the U.S. Code, 18 U.S.C.A. § 80 (Section 35 of the Criminal Code), as amended by the Act of June 18, 1934, as well as the Act of February 22, 1935, 15 U.S.C.A. §§ 715–715*l*, known as the Connally Hot Oil Act. The remaining ten counts cover substantive offenses sought to be laid under Section 80 of Tit. 18 of the Code, 18 U.S.C.A. § 80.

Defendants have filed a lengthy demurrer, attacking the indictment on numerous grounds, which may be summarized under the following headings: (1) That the facts alleged in all counts do not charge offenses against the United States; (2) all counts are too vague and indefinite to enable defendants to plead thereto; and (3) in any event, the facts alleged in counts 2 to 11, inclusive, are insufficient to bring them within the perview of Section 80 of Tit. 18, U.S.C., 18 U.S.C.A. § 80.

Pertinent portions of the bill are quoted as follows:

" * * * Defendants, did heretofore, to-wit, continuously from on or about March 1, 1935, up to on or about January 1, 1938, unlawfully, knowingly, fraudulently, wilfully and feloniously agree, combine, confederate, and conspire among themselves and with each other, to commit divers and sundry offenses against the laws of the United States of America, to-wit, to knowingly, wilfully, unlawfully, and feloniously make and cause to be made, use and cause to be used, false affidavits relating to matters within the jurisdiction of the Department of the Interior and the Secretary of the Interior, and the Federal Tender Board No. 1, Kilgore, Texas, knowing the same to contain fraudulent and fictitious statements, the said Department of the Interior and the said Secretary of the Interior and the said Federal Tender Board No. 1, Kilgore, Texas, then and there being, each of them, a Governmental Department and Agency of the United States.

"The Grand Jurors further present that a more definite description of the unlawful agreement and conspiracy to commit said offenses in violation of the laws of the United States, is as follows:

"That certain of the said Defendants would produce and cause to be produced oil from certain leases hereinafter described, situated in Gregg and Upshur Counties, Texas, and within jurisdiction of this Court, which oil would be produced in violation of the laws of Texas, and the rules and regulations of the Railroad Commission of Texas, and in excess of the amounts of oil permitted to be produced from the wells on said leases. Certain others of the said Defendants were to, without lawful authority and without approved tenders or permits of the Railroad Commission of Texas or the Federal Tender Board, No. 1, Kilgore, Texas, transport the said unlawfully produced oil from the said leases to the Gilliland Refining Company at Gladewater, Gregg County, Texas, or cause the same to be done, and certain others of said Defendants were to refine the said unlawfully produced oil so transported, and manufacture it into contraband products at the said Gilliland Refinery in the City of Gladewater, Texas, or cause the same to be done. Certain others of the said Defendants were to sell, ship, and deliver into interstate commerce, the said contraband products so manufactured and cause the same to be done, without lawful authority and in violation of the laws of the United States.

"That said Defendants would make and cause to be made, use and cause to be used false and fraudulent affidavits in, and relating to, matters within the jurisdiction of said Department of the Interior and the said Secretary of the Interior and the said Federal Tender Board No. 1, Kilgore, Texas, knowing that said affidavits would contain fraudulent and fictitious statements, and which false affidavits would relate to and cover reports designated as (1) Federal Form D., Monthly Producer's Reports to be filed with said Federal Tender Board No. 1, Kilgore, Texas, and which would purport to show the amount of petroleum oil produced from the A. J. Sanders Lease, T. Allen Survey, Upshur County, Texas, the Walker-Harris Lease, Martha Dillard Survey, Gregg County, Texas, and the J. H. Sheppard Lease, T. Allen Survey, Upshur County, Texas, from on or about the 1st day of March, 1935, up to and including about the 30th day of June, 1936; (2) Federal Form C, Monthly Pipe Line and Storage Reports to be filed with said Federal Tender Board No. 1, Kilgore, Texas, and which would purport to show the amount of petroleum oil received by the pipe lines and the amount of oil delivered by the pipe lines of the Gilliland Refining Company and the Gilliland Pipe Line Company, from on or about the 1st day of

March, 1935, up to and including about the 20th day of October, 1936; (3) Federal Form A, Refinery and Reclamation Plant Reports to be filed with said Federal Tender Board No. 1, Kilgore, Texas, and would purport to show the amount of petroleum oil and products thereof in refinery storage at the 1st of each month, and would purport to show the amount of petroleum oil and products received each month, the amount of such materials consumed in manufacturing operations, the amount of products manufactured therefrom, and the amount of deliveries of all oil and products, said reports to be made on behalf of the Gilliland Refining Company, Gladewater, Texas, from on or about the 1st day of March, 1935, up to and including about the 20th day of October, 1936."

Some thirty-five overt acts are charged, none of which need be considered at this time.

The substantive counts (2 to 11) are similar, and No. 2 is quoted for purposes of illustration:

"* * * on or about April 30, 1935, (Defendants) * * * * * did knowingly, wilfully, unlawfully and feloniously make and cause to be made, use and cause to be used a false and fraudulent affidavit knowing the same to contain false and fictitious statements relating to a matter within the jurisdiction of the Department of the Interior and the Secretary of the Interior and the Federal Tender Board No. 1, Kilgore, Texas, the said Department of the Interior and the said Secretary of the Interior and the said Federal Tender Board No. 1, Kilgore Texas, then and there being each of them a Governmental Department and Agency of the United States, that is to say, said Defendants did then and there make and cause to be made, use and cause to be used, and deliver to the said Federal Tender Board No. 1, Kilgore, Texas, a report in writing designated as Federal Form D, Monthly Producer's Report of the United States Department of the Interior, Petroleum Administration, in the name of Oil Inc., purporting to show the amount of petroleum oil produced during the month of March, 1935, from the oil wells located on the A. J. Sanders Lease, T. Allen Survey, Upshur County, Texas, and attached to and forming a part of said report, said Defendants made and caused to be made, used

and caused to be used the following affidavit and statement:

" 'State of Texas }
 'County of Gregg }

" 'Before me, the undersigned authority, on this day personally appeared F. Jones known to me to be the person whose name is subscribed to this instrument, who after being by me duly sworn on oath that he is the person in charge of superintending the production from all wells on the above property, and is employed in the capacity of Agent and that said report contains no misstatement or inaccuracy within the knowledge of affiant, and that no pertinent matter inquired about in said report and within the knowledge of said affiant has been omitted from said report, and that said report is a correct statement of the facts therein recited.

" '/s/ Frank Jones

" 'Sworn to and subscribed before me, this 20 day of April, 1935.

" '(Seal) /s/ E. P. Williams
" 'Notary Public
Gregg County, Texas'

"which affidavit and statement having then and there been made and caused to be made, and executed and delivered, was attached to and formed a part of said Federal Form D, Monthly Producer's Report purporting to set forth and report to the said Federal Tender Board No. 1, Kilgore, Texas, the amount of oil produced from said wells during the month of March, 1935, in which said affidavit and statement and report made and caused to be made, and used and caused to be used, as aforesaid, the said Defendants knowingly, wilfully, unlawfully, and feloniously made false and fraudulent statements, namely, that there were produced from the wells located upon said A. J. Sanders Lease, T. Allen Survey, Upshur County, Texas, during the month of March, 1935, 9,176.4 barrels of oil, when as a matter of fact, the true facts then and there were that a much greater quantity of oil, to-wit, more than 15,000 barrels of oil were produced during said month of March, 1935, from said wells located on said A. J. Sanders Lease, T. Allen Survey, Upshur County, Texas, and the said Defendants did then and there well know that said report, affidavit and statement was false, fraudulent and fictitious in that

184

they well knew that more than 15,000 barrels of oil were produced during the month of March, 1935, from said wells located as aforesaid, contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States of America."

■ Of course, the first count is laid under Section 88, Tit. 18 of the Code, 18 U.S.C.A. § 88, Section 37 of the Criminal Code, denouncing conspiracies. To show conspiracy, the fact charged must bring the act or acts to be committed within the provisions of some other criminal statute. The Government insists that the allegations of the present bill are encompassed by both said Section 80 and the Connally Act. Section 80, Tit. 18, of the U.S.Code, 18 U.S.C.A. § 80, reads:

"Whoever shall make or cause to be made or present, or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry *in any matter within the jurisdiction of any department or agency of the United States* or of any corporation in which the United States of America is a stockholder, shall be fined not more than $10,000 or imprisoned not more than ten years, or both." (Emphasis by the author of the present opinion.)

Pertinent provisions of the Connally Act are as follows:

"Section [§] 715b. *Interstate transportation of contraband oil forbidden*

"The shipment or transportation in interstate commerce from any State of contraband oil produced in such State is hereby prohibited. For the purposes of this section contraband oil shall not be deemed to have been produced in a State if none of the petroleum constituting such contraband oil, or from which it was produced or derived, was produced, transported, or withdrawn from storage in excess of the amounts permitted to be produced, transported, or withdrawn from storage under the laws of such State or under any regulation or order prescribed thereunder by any board, commission, officer, or other duly authorized agency of such State. * * *"

"Section [§] 715d. *Rules and regulations; certificates of clearance; issuance by boards; review of denial of certificate by board*

"(a) The President shall prescribe such regulations as he finds necessary or appropriate for the enforcement of the provisions of this chapter, including but not limited to regulations requiring reports, maps, affidavits, and other documents relating to the production, storage, refining, processing, transporting, or handling of petroleum and petroleum products, and providing for the keeping of books and records, and for the inspection of such books and records and of properties and facilities."

"Section [§] 715e. *Penalties for violation of chapter*

"Any person knowingly violating any provision of this chapter or any regulation prescribed thereunder shall upon conviction be punished by a fine of not to exceed $2,000 or by imprisonment for not to exceed six months, or by both such fine and imprisonment. * * *"

The applicable regulation under this Act provides: "Each producer, refiner, reclamation plant, casinghead gasoline plant, pipe line, and storer of petroleum or petroleum products in any designated area shall file with the Board for said area monthly reports on forms approved by the Secretary of the Interior. Each report on such forms shall be subscribed and sworn to by the person required to file the same, using the form of affidavit therein contained, and the person required to file the report must make therein a full, truthful and complete disclosure of all the information required on the form and necessary to the full use thereof."

Reduced to simple language, the issues, as I see them, are, does Section 80, Tit. 18 of the Code, 18 U.S.C.A. § 80, apply to

the facts charged in this indictment; and if not, does the first count charge a conspiracy under the Connally Act?

Section 35 of the Criminal Code, of which Section 80 forms a part, originated as the Act of March 2, 1863, 12 Stat. 696, and later became Section 5438 of the Revised Statutes, under the codification of December 1, 1873, approved June 22, 1874. Up to that time it carried a single penalty as to all offenses of "not less than one nor more than five years" at hard labor "or" a fine of "not less than $1,000 nor more than $5,000." An amendment of May 30, 1908, 35 Stat. 555, along with other minor changes, separated the offenses, and provided as to some penalties of "not more than five years" imprisonment (at hard labor), "or" a fine of "not more than five thousand dollars" with no minimum; and as to others, evidently considered as of lesser consequence, "not more than two years" imprisonment "and" a fine "not exceeding five hundred dollars." The Act of March 4, 1909, 35 Stat. 1088, entitled an "Act To codify, revise, and amend the penal laws of the United States", declared that "they hereby are, codified, revised, and amended, with title, chapters, headnotes, and sections, entitled, numbered, and to read as follows": "Chapter Four" was headed "Offenses Against The Operations Of The Government", and, beginning with Section 27 running through Section 84, the subject matter of each section was listed by a short description, and former Section 5438 of the Revised Statutes (the one involved here) received the number "35. Making or presenting false claims." The only changes made in this section were to add the words "or both" (imprisonment or fine) at the end of the first clause which provided greater penalties, the substitution of a period for the semicolon formerly used, and the transposition of the provisions for fine in each instance to precede the terms of imprisonment, but the conjunction "and" was retained between the fine and imprisonment of the lesser class of offenses.

Unsuccessful attempts having been made under Section 35 to punish persons committing frauds against some of the corporations created by Congress during the World War, in which the Government owned all or a part of the stock (Salas v. United States, 2 Cir., 234 F. 842; United States v. Bowman, 260 U.S. 94,

43 S.Ct. 39, 67 L.Ed. 149), Congress passed the amendment of October 23, 1918, 40 Stat. 1015, which made this Section applicable to "any corporation in which the United States of America is a stockholder." The Act of April 4, 1938, merely divided Section 35 into Subsections (A), (B) and (C), and separated them into paragraphs, 18 U.S.C.A. § 80 et seq.

Up to this point, it can not be doubted that the purpose of Section 35 of the Criminal Code was to reach "Offenses Against The Operations Of The Government", by punishing those "making or presenting false claims" against it. Therefore, this case must turn upon the effect of the amendment of June 18, 1934, 48 Stat. 996, 18 U.S.C.A. § 80. For convenience, Subsection (A) is again quoted with the controverted clause emphasized as follows:

"Sec. 35. (A) Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry *in any matter within the jurisdiction of any department or agency of the United States* or of any corporation in which the United States of America is a stockholder; or whoever shall enter into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim; and whoever, having charge, possession, custody, or control of any money or other public property used or to

be used in the military or naval service, with intent to defraud the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, or willfully to conceal such money or other property, shall deliver or cause to be delivered to such person having authority to receive the same any amount of such money or other property less than that for which he received a certificate or took a receipt; or whoever, being authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, shall make or deliver the same to any person without a full knowledge of the truth of the facts stated therein and with intent to defraud the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, shall be fined not more than $10,000 or imprisoned not more than ten years, or both." (Emphasis by the author of the present opinion.)

It is contended by the Government that this language added by the amendment of June 18, 1934, emphasized in the quotation, has broadened it to include affidavits, reports, vouchers, etc., in connection with *any* matter over which any Department of the Government or its agencies has jurisdiction, whether they have any relation to claims or frauds in the "operations of the Government" or not. If correct, of course, this would embrace any false affidavits or reports about oil produced in violation of the state laws since administration of the Connally Act has been committed to the Interior Department. On the other hand, defendants insist that both the history of Section 35, as above recited, and the rules of strict construction which must be applied to criminal statutes require that the amendment of 1934 shall be confined to such acts when committed in connection with operations of the Government as such; and, further, that the Connally Act was intended to cover the entire field or subject matter of excluding hot oil from Interstate Commerce with the consequent repeal of all other provisions dealing with it. The Government points to a report of the Senate Judiciary Committee of May 28, 1934, when this amendment was being considered as supporting its contention. That report is as follows:

"The Bill amends section 35 of the Criminal Code so as to provide penalties for wilful injuries to or depredations against any property of the United States, any of its branches or departments, or any corporation in which the United States is a stockholder, and any property which is in the course of manufacture or construction for the War or Navy Departments.

*"The first two committee amendments were proposed by the Department of the Interior for the purpose of reaching a large number of cases involving the shipment of 'hot' oil, where false papers are presented in connection therewith, and also those cases within the Public Works Administration where contractors are performing work payable from the Public Works Administration appropriation, and false certificates are made as to the actual wages paid. The third amendment is a clairfying amendment to remove an apparent ambiguity in the House bill.* (Emphasis by the author of the present opinion.)

█ Of course, where there is ambiguity or uncertainty, such reports may be resorted to in construing a statute, particularly to save it from unconstitutionality, but they can not serve to overturn well established principles of interpretation. Granting that the Interior Department desired and thought it could make the harsh penalties of this section of the Criminal Code applicable to its administration of the Connally Act, that purpose could not be accomplished except by the use of proper legislative methods. While it is true that everyone is presumed to know the law, still it must be in such form that a reasonable person reading it can understand what is denounced and the penalty to be expected. Can it be fairly said that anyone, examining the provisions of both the Connally Act and Section 80, would understand that, in addition to the comparatively light penalties imposed by the former for its violation, if he made a false affidavit or report with respect to matters covered by its provisions, he could be imprisoned for ten years and fined $10,000; whereas, if he transported a million barrels of hot oil in interstate commerce, without making such affidavit or report, he could be imprisoned not more than six months or fined not more than $2,000? In other words, that a single step of this particular nature would subject him to punishment twenty times as

great as the completed act which the law was intended to prevent? It would seem that before such an astounding conclusion is reached, the purpose of Congress to make it possible should be clearly established. Under the well known doctrine of ejusdem generis, general or omnibus clauses, such as "in any matters within the jurisdiction of any department or agency", would mean matters of a similar or kindred nature to those dealt with in the explicit provisions of the law, in this instance, such as claims against, rights to or controversies about funds or property involved in "operations of the Government." To hold with the prosecution in this case, would be to say that Congress intended to create a multitude of crimes with respect to operations of the innumerable and ever growing departments, bureaus, and agencies of the Government by the simple means of amending in general terms a statute which had always been understood to apply to matters in which the Government was financially interested.

In United States v. Keitel, 211 U.S. 370, 29 S.Ct. 123, 125, 53 L.Ed. 230, the Supreme Court had under consideration an indictment consisting of two counts, the first of which charged a conspiracy to illegally obtain title to coal lands belonging to the United States, in violation of Section 5440 of the Revised Statutes, 18 U.S. C.A. § 88; and a second count charging a conspiracy to violate Section 4746, 18 U. S.C.A. § 81, by "making and presenting, and causing to be made and presented, in connection with the entries of coal land, certain false, forged [and] fictitious * * affidavits and papers." The court called attention to the fact that the last mentioned section had been one bearing the title of "pensions" and that the amendment of July 7, 1898, 30 Stat. 718, had added thereto a clause that "every person who * * * makes or assists in the making * * * of any false * * * affidavit, [etc.], concerning any claim for pension * * * or pertaining to any other matter within the jurisdiction of the Commissioner of Pensions or of the Secretary of the Interior" should be punished as provided therein. As stated, the second count of the indictment was laid under this section 4746 as thus amended and charged the making of false and fictitious papers, in connection with coal lands of the Government, which were under the jurisdiction of the Secretary of the In-

terior. The lower court had quashed both counts of the indictment, the first of which has no bearing upon the present case, and in disposing of the appeal of the Government with respect to the second count, the court, through Justice White, later Chief Justice, 211 U.S. at page 395, 29 S.Ct. at page 131, 53 L.Ed. 230, had this to say:

"It was conceded by the United States in argument, and indeed it could not have been in reason denied, that the section in question, as originally embodied under the head of 'Pensions' in the Revised Statutes, related exclusively to pension or bounty land claims. No crime, therefore, could have been predicated under the original section upon the affidavits or other papers used in making the coal-land entries, as alleged in the indictment. The contention, therefore, as now made by the United States, to sustain the second count, rests upon the proposition that the amendment to § 4746 by the act of July 7, 1898 [18 U.S.C.A. § 81], had the effect of bringing within that section subjects to which, prior to the amendment, the section in no manner related. Turning to the text, which we have previously quoted, with the provisions incorporated by the amending act printed therein in italics, it will be observed that every enumeration or description of new acts or papers in addition to those embraced in the section prior to the amendment, alone concern pension or bounty land claims. The argument as to the broad scope of the statute in its present form rests therefore alone upon the proposition that because the amendatory statute, in repeating the original words, viz., 'concerning any claim for pension or payment thereof, or pertaining to any other matter within the jurisdiction of the Commissioner of Pensions,' adds to them the following, viz., 'or of the Secretary of the Interior,' therefore the statute now embraces not only acts done in connection with pension or bounty land claims, but all acts of prohibited character as to any matter coming before the Secretary of the Interior, or subject to so come, entirely without reference to whether they were in pension or bounty land claims or proceedings. But to adopt this latitudinarian construction would cause the statute to create a multitude of new and substantive crimes, wholly disconnected with claims for pensions or bounty land, with which latter it was alone evidently the purpose of the

original as well as the amendatory statute to deal. We think to state the proposition is in effect to answer it. When the original text and the amendments which were made are taken into view, the conclusion inevitably follows that the purpose of the amendment was but to more specifically define the pension or bounty land papers, etc., with which the statute was concerned, and to enlarge the operation of the statute in respect to such papers so as to cause it to be criminal to use the pension or bounty land papers, etc., to which the statute refers, as well before the Secretary of the Interior as before the Commissioner of Pensions. In other words, that the only purpose of the amendment was to more fully deal with the subjects with which the provision which was amended dealt, and not by way of the amendment to legislate concerning every conceivable subject coming within the jurisdiction of the Secretary of the Interior. To otherwise hold would not only violate the most elementary rules of construction, but would require the treating as superfluous the new words of enumeration concerning pension matters which the amendatory act expressed. This follows, because, if the adding by way of amendment of the words 'or of the Secretary of the Interior,' contemplated bringing within the criminal inhibitions of the statute every act of a like nature to those forbidden, done in connection with every subject within the jurisdiction of the Secretary of the Interior, then the new enumerations made in the amendment were wholly unnecessary, because, without enumeration, they would have been embraced in the statute as amended. Indeed, if the purpose intended to be accomplished by the amendment had been to embrace all acts of the prohibited nature as to every subject within the jurisdiction of the Secretary of the Interior, no reason can be suggested why the new legislation should have taken the form of mere amendment to the section of the statutes which was alone concerned with pension and bounty land claims. Construing the statute as relating only to the subject of pension and bounty land claims coming within the authority of the Commissioner of Pensions or the Secretary of the Interior, it follows that a violation of its provisions could not arise from the acts charged in the indictment concerning the coal-land entries." See, also, United States v. Salen, 235 U. S. 237, 35 S.Ct. 51, 59 L.Ed. 210.

It is my belief that the principle involved in the present case is closely parallel to that applied in those just cited.

Counsel for the Government have cited a number of cases as supporting its contention that Section 80 can be made to apply to the present indictment. A few of them will be analyzed to demonstrate what is believed to be the lack of application. In United States v. Mellon, 2 Cir., 96 F.2d 462, the very language quoted by counsel shows that Mellon and his associates were charged with a conspiracy to commit the offense of obtaining a modernization loan of $575 under the provisions of Tit. 1, Section 2 of the National Housing Administration Act, Tit. 12, Section 1703, U.S.C., 12 U.S.C.A. § 703, "which application and loan were matters within the jurisdiction of the Federal Housing Administration, an agency of the United States." Plainly, the well understood object of Section 35 of the Criminal Code to protect the Government against frauds heretofore discussed was involved.

The case of Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 512, 68 L.Ed. 968, also cited, I think, supports the conclusion reached in the present case. Counsel quote an excerpt therefrom to the effect that " * * * It is not necessary that the government shall be subjected to * * * pecuniary loss * *." This is true of any indictment for conspiracy, that is, it does not have to be charged as having succeeded, but the commission of any overt act in furtherance thereof is sufficient. Hammerschmidt was charged, with others, with conspiracy "to defraud the United States by impairing, obstructing, and defeating a lawful function of its government * * *", to-wit, the execution of the Selective Service Act of May 18, 1917, Chap. 15, 40 Stat. 76. Chief Justice Taft stated that the indictment was based upon certain language of Justice Lurton in Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 253, 54 L.Ed. 569, 17 Ann.Cas. 1112, to the effect that "if two or more persons conspire * * * to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable," etc. In sustaining the position of the defendants that the Selective Service Act could not properly be brought within the reach of such a

charge, Justice Taft at page 187 of 265 U.S., at page 512 of 44 S.Ct., 68 L.Ed. 968, said:

"It is obvious that the writer of the opinion and the court were not considering whether deceit or trickery was essential to satisfy the defrauding required under the statute. The facts in the case were such that that question was not presented. The deceit of the public, the trickery in the advance publication secured by bribery of an official, and the falsification of the reports made the fraud and deceit so clear as the gist of the offenses actually charged that their presence was not in dispute. The sole question was whether the fraud there practiced must have inflicted upon the government pecuniary loss, or whether its purpose and effect to defeat a lawful function of the government and injure others thereby was enough. That was all that Mr. Justice Lurton's words can be construed to mean. The cases in which this case has been referred to involved unquestioned deceit or false pretense, and it was only cited in them to the point that financial loss of the government is not necessary to violate the section. United States v. Foster, 233 U.S. 515, 526, 34 S.Ct. 666, 58 L.Ed. 1074; United States v. Barnow, 239 U.S. 74, 79, 36 S.Ct. 19, 60 L.Ed. 155. See, also, United States v. Plyler, 222 U.S. 15, 32 S.Ct. 6, 56 L.Ed. 70, in respect to section 5418, R.S.

"To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention. It is true that the words 'to defraud' as used in some statutes have been given a wide meaning, wider than their ordinary scope. They usually signify the deprivation of something of value by trick, deceit, chicane or overreaching. They do not extend to theft by violence. They refer rather to wronging one in his property rights by dishonest methods or schemes. One would not class robbery or burglary among frauds. In Horman v. United States [6 Cir.] 116 F. 350, 53 C.C.A. 570, Section 5480, R.S., as amended March 2, 1889 ([c. 393] 25 Stat. 873), making it a crime to devise any scheme or artifice to defraud by use of the mails and opening correspondence with any person, and to mail a letter in execution thereof, was held to be violated by the sending of a letter threatening to blacken the character of another, unless that other paid the blackmailer money. It was held that the word 'scheme' in that section was of broader meaning and did not necessarily involve trickery or cunning in the scheme, if use of the mails was part of it; that intent to defraud in such a statute was satisfied by the wrongful purpose of injuring one in his property rights. The question had much consideration. The decision, however, went to the verge and should be confined to pecuniary or property injury inflicted by a scheme to use the mails for the purpose. Section 5480 has since been again amended to make its scope clearer. Its construction in the Horman Case cannot be used as authority to include within the legal definition of a conspiracy to defraud the United States a mere open defiance of the governmental purpose to enforce a law by urging persons subject to it to disobey it."

I think the language thus quoted also effectively disposed of Haas v. Henkel, supra, cited by the Government in the present case.

Counsel for the Government have also cited the case of Claude E. Spivey v. United States, 109 F.2d 181, 183, in which the opinion was handed down by the Court of Appeals for this Circuit on January 15, 1940. There the indictment charged offenses under Section 80, 83 and 338 of Tit. 18 of the U.S.C.A. It involved use of the mails to defraud, the "making of false and fictitious statements in violation of Section 80" and a "conspiracy to defraud the Government by obtaining payment or allowance of false or fraudulent claims." The facts charged were summarized by the Court as follows:

"Defendants, owners of a cotton gin and warehouse, in pursuance of a scheme by false pretenses and practices to obtain moneys from and through the Commodity Credit Corporation, in which the United States of America was a stockholder and which was an agency of the United States, would induce farmers bringing their cotton

to be ginned, to sign in blank, notes and loan agreements, commonly known as Commodity Credit Corporation cotton producer's notes. The notes and agreements so signed would be padded, that is, filled out for sums in excess of the amounts actually obtained by the farmers thereon, and with bales of cotton, which the signers thereof had not raised or claimed; in some instances the names of makers of the notes would be forged. Thereupon defendant would take the notes to divers and sundry banks and secure credit thereon, and the banks, believing the notes were genuine, would assign them to the Commodity Credit Corporation.

"The charge in the eighteen counts under Section 80, was that the notes and cotton agreements aforesaid, would be fraudulently and fictitiously prepared and altered, so as to show thereon, sums of money and bales of cotton in excess of the amounts obtained and bales owned by the purported signers of the notes. Count twenty, charged that the things done by the defendants were and amounted to, an agreement or conspiracy to defraud the Government by obtaining or aiding to obtain, the payment or allowance of false or fraudulent claims."

From the second paragraph of the quotation it can readily be seen that in so far as Section 80 of Tit. 18 of the Code, 18 U.S.C.A. § 80, was concerned, the charge covered false, forged, and fictitious papers, seeking to fraudulently obtain money from the Government. Counsel have referred to the following language as supporting their contention: "The points made as to the convictions under Section 80 are no better taken. The language of the section is plain and completely comprehensive, and that it was intended to, and does apply to situations of the kind in question here, is equally plain. For, it stands admitted, not only that the Commodity Credit Corporation is an agency of the United States, and that the matters in question were the lending of money on farmer's notes, which come within the scope of its agency, but that the United States, though the stock is nominally held by officials of the Government, is the owner and beneficial holder of all of its stock. This being so, the fact that the stock is not in the name of the United States is immaterial. *The force and effect of statutes of this kind, designed to prevent frauds upon the Government may not be frittered away by a mere literal construction.* Read as a whole, it is perfectly plain, we think, that the statute includes, the Commodity Credit Corporation, a creation of the Government, with its stock by the statutes of its creation, standing in the name of officials of the United States. Equally untenable is appellee's argument that the Section must be held to be limited to claims against, and as not extending to, negotiations with, the Government. While Criminal Statutes, may not by process of construction, be extended beyond their reasonable and natural meaning, neither may they be, by the same process, deprived of their natural meaning. The statute makes it an offense to 'falsify * * * or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements * * * in any matter within the jurisdiction of any department or agency,' etc. *The facts disclose falsification, tricks, schemes and devices in matters within the jurisdiction of the Commodity Credit Corporation, the Corporation covered by the Act. The fact that the Act in other portions deals with claims against the Government, does not, in any manner take from its force when dealing with other matters than claims.*"

They relied particularly upon the last two sentences just quoted. However, the decision shows plainly that it was dealing with the facts alleged as hereinabove quoted, involving a scheme to defraud the Government, and I think its import must be restricted accordingly. In any event, I do not consider the case authority for the contention of the Government in the present one.

 Notwithstanding, I have concluded that Section 35 of the Criminal Code does not apply, yet I am of the opinion that the first count of the indictment sufficiently charges a conspiracy to violate the Connally Act. It can make no difference that the allegations of fact were also intended to show an unlawful undertaking to commit offenses under Section 35 of the Criminal Code. The following is quoted from the indictment to demonstrate that the conspiracy was also laid under the Connally Act: "'* * * produce and cause to be produced oil from certain leases hereinafter described, situated in Gregg and Upshur Counties, Texas, and within jurisdiction of this Court, which oil would be produced in violation of the

laws of Texas, and the rules and regulations of the Railroad Commission of Texas, and in excess of the amounts of oil permitted to be produced from the wells on said leases. Certain others of the said defendants were to, without lawful authority and without approved tenders or permits of the Railroad Commission of Texas or the Federal Tender Board No. 1 of Kilgore, Texas, transport the said unlawfully produced oil from the said leases to the Gilliland Refining Company at Gladewater, Gregg County, Texas, or cause the same to be done, and certain others of said defendants were to refine the said unlawfully produced oil so transported, and manufacture it into contraband products at the said Gilliland Refinery in the City of Gladewater, Texas, or cause the same to be done. Certain others of the said defendants were to sell, ship, and deliver into interstate commerce, the said contraband products so manufactured and cause the same to be done without lawful authority and in violation of the laws of the United States.' "

This I believe is sufficient. See Short v. United States, 4 Cir., 91 F.2d 614, 112 A.L.R. 969; Capone v. United States, 7 Cir., 51 F.2d 609, 76 A.L.R. 1534.

Without finding it necessary to discuss the contentions of the defendants in regard to the insufficiency of the allegations of the conspiracy, I think it suffices to say that all of the information needed is given to enable the defendants to plead thereto.

My conclusion is that the demurrer should therefore be overruled as to count 1 and sustained as to the remaining ten counts of the indictment.