ROGERS, Circuit Judge,
dissenting:
The court today interprets two provisions in the Immigration and Nationality Act as criminalizing conduct outside of the United States by foreign nationals. In doing so, the court ignores clear instruction from the Supreme Court that Congress must clearly state its intention to apply statutes extraterritorially and that otherwise courts are to interpret ambiguous statutes as territorially limited. Congress has not clearly stated its intent to apply the attempted bringing and the encouragement/indueement provisions of 8 U.S.C. § 1324 extraterritorially in order to protect United States borders, and the structure and operation of the two provisions, in which this court finds an implicit command of extraterritorial application, are consistent with the territorial limitation that is generally presumed of statutes. Moreover, the legislative history is clear that Congress did not intend the attempted bringing provision to apply outside the territorial jurisdiction of the United States. Accordingly, because there is no clear “affirmative evidence,” Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 176, 113 S.Ct. 2549, 2561, 125 L.Ed.2d 128 (1993), to overcome the presumption against applying a statute extraterritorially, the indictments under 8 U.S.C. §§ 1324(a)(1)(A)(i), (a)(1)(A)(iv), and (a)(1)(A)(v) should have been dismissed, and I therefore respectfully dissent.
I.
The Supreme Court has long upheld a canon of statutory construction that “legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.” EEOC v. Arabian American Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 *1352 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). In two recent cases, Sale, 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128, and Arabian American Oil Co., 499 U.S. at 248-59, 111 S.Ct. at 1230, the Court has re-emphasized this longstanding presumption in uncompromising terms: laws are deemed to only apply within the territorial jurisdiction of the United States unless Congress provides “affirmative evidence” to the contrary. See Sale, 509 U.S. at 176, 113 S.Ct. at 2561. Such evidence must be “clearly expressed.” Arabian American Oil Co., 499 U.S. at 248, 111 S.Ct. at 1230. While the canon in part has roots, as this court notes, see Opinion at 10-11, in the recognition that Congress “is primarily concerned with domestic conditions,” Arabian American Oil Co., 499 U.S. at 248, 111 S.Ct. at 1230, it also reflects “the desire to avoid conflict with the laws of other nations.” Sale, 509 U.S. at 174, 113 S.Ct. at 2560. Decisions about when to subject foreign nationals and foreign conduct to the United States’ laws involve delicate questions of jurisdiction and international relations, and courts, which lack the foreign policy expertise of the legislative and executive branches, must tread carefully and err on the side of limiting statutes to domestic application if there is doubt as to Congress’ intentions. This Term the Supreme Court re-emphasized in F. Hoffman-La Roche Ltd. v. Empagran S.A., — U.S. -, --, 124 S.Ct. 2359, 2366, 159 L.Ed.2d 226 (2004), that it “ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations.” If a statute is unclear and reasonably permits the reading that it applies only territorially, the court should not read it to apply abroad, even if doing so might be “the more natural reading of the statutory language.” Id. at 2372. Nothing in the Supreme Court’s opinions in Sale and Arabian American Oil, both of which used broad and generalized language, or the recent opinion in Empagran, indicates that the Court was doing anything other than announcing, and strengthening, a generally applicable rule of statutory construction.
This court, however, now reaches a holding that effectively eviscerates this instruction. Treating the canon as nothing more than a “contextual rule” or “linguistic” principle, it states that the presumption against extraterritoriality can be overcome so long as there are “contextual reasons” for disregarding it. Specifically, this court’s principal argument is that the canon’s requirement of “affirmative evidence” is satisfied when a statute concerns “more than merely ‘domestic conditions.’ ” Op. at 1345. In other words, if a statute deals with a subject area that is not purely domestic, the court reasons, that provides the “context” indicating Congress’ intent to apply the statute extraterritorially. See id. This cramped view of the canon is circular, making its applicability depend in the first instance on whether a statute is “domestic” when that is the question that application of the canon is supposed to resolve. Moreover, the court’s “contextual reasons for reading the text otherwise” standard lacks a basis in the jurisprudence of the Supreme Court, which has stated that the standard for overcoming the canon against extraterritoriality is the higher hurdle of “affirmative evidence,” Sale, 509 U.S. at 176, 113 S.Ct. at 2561, and must be “clearly expressed.” Arabian American Oil Co., 499 U.S. at 248, 111 S.Ct. at 1230. The court’s premise that a non-domestic subject itself supplies the “affirmative evidence” sufficient to overcome the canon, see Op. at 1344-45, is in direct conflict with the Second Circuit, which explained in Kollias v. D & G Marine Maintenance, 29 F.3d 67 (2nd Cir.1994), in light of the Supreme Court’s recent decisions that “seem to require that all statutes, without *1353 exception, be construed to apply within the United States only, unless a contrary intent appears” (as it did in the statute at issue, which applied “on the high seas,” id. at 73-74), that a nondomestic subject matter does not suffice to render inapplicable the canon against extraterritoriality. Id. at 71 (emphasis in original). While certain subject areas (such as the Immigration and Nationality Act, at issue in Sale and the instant case, or maritime law as in Kollias) may imply that Congress is more than “primarily concerned with domestic conditions,” Arabian American Oil Co., 499 U.S. at 248, 111 S.Ct. at 1230, they do nothing to alleviate the prudential concerns embodied in the canon, which the court today ignores.
The prudential concerns behind the canon are particularly significant in the criminal context, where the extraterritorial application of the criminal law of the United States may criminalize conduct that is legal in the countries in which it is committed, without providing corresponding constitutional protections against unreasonable searches and seizures, and the use of force at the arrest stage. Cf. U.S. v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). Exposing foreign nationals to the full coercive force of the United States’ criminal laws without many of the corresponding constitutional protections is a serious step, not only for the individuals charged but also for their host countries, which have interests both in their own jurisdiction and in the freedom of their citizens who, under their laws, have often committed no crime. Such a serious and consequential step, if it is to be taken at all, must be taken by Congress, and must be taken by Congress clearly; the decision is not left for courts to intuit on the basis of statutes that can plausibly be read either way.
Furthermore, the court’s holding that the canon can be overcome by a statute’s non-domestic focus runs contrary to Sale, and its attempt to distinguish the case is unconvincing. See Op. at 1347-48. In Sale, the Supreme Court applied the canon to a provision of the Immigration and Nationality Act (“INA”) in order to determine, as here, the applicability of that Act to aliens interdicted on the high seas. The case highlights the wide applicability of the canon, as well as how high the hurdle of “affirmative evidence” is. The provision at issue in Sale prohibited the “return” of refugees before giving them an asylum hearing, in part to implement the United Nations Convention Relating to Status of Refugees, which the United States has ratified. Implementation of a treaty defining the United States’ obligations with respect to refugees is hardly a “domestic condition,” notwithstanding this court’s valiant attempt to frame it as such. See Op. at 1347-48. Absent the canon against extraterritoriality, the “natural inference,” Op. at 1345, or “more natural reading,” Empagran, — U.S. at -, 124 S.Ct. at 2372, would be that if the United States is forbidden by treaty from “returning]” refugees to their home country without a hearing, “contextual reasons” would suggest that the functionally equivalent step of intercepting them prior to landing and returning them to their home countries would equally violate the United States’ obligations under the treaty and thus under the implementing statute. Notwithstanding this inference, the Supreme Court held that the relevant provision of the INA was inapplicable because Congress had not affirmatively extended its reach beyond United States borders. In Sale, the Court expressly stated that its holding did not depend, as this court suggests, see Op. at 1348 n.2, on the fact that the INA referred to deportation proceedings and referenced the Attorney General, *1354 a domestic official. Rather, the Supreme Court stated that “[e]ven if [the provision respecting the return of refugees] were not limited to strictly domestic procedures, the presumption that Acts of Congress do not ordinarily apply outside our borders would support an interpretation ... as applying only within United States territory.” 509 U.S. at 173, 113 S.Ct. at 2559.
Sale should put to rest the court’s contention that the canon against extraterritoriality is satisfied by legislation touching upon non-domestic concerns. And as discussed, prudential factors favoring application of the canon to criminal provisions of the INA are at least as strong, if not stronger, than those for applying it to civil provisions.
The court’s reliance on United States v. Bowman, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), to support its theory that a statute’s non-domestic focus overcomes the presumption against extraterritoriality, is misplaced. See Op. at 1345^47. The Supreme Court in Bowman dealt with the extraterritorial applicability to United States citizens of offenses against the United States government, noting that the government has a right to defend itself against such crimes “especially if committed by its own citizens, officers, or agents,” Bowman, 260 U.S. at 98, 43 S.Ct. at 41, whom the court ruled could be held to answer to the “crime against the government to which they owe allegiance.” Id. at 102, 43 S.Ct. at 41. Bowman left open whether, as here, such laws should be read as applying extraterritorially to foreign nationals without express Congressional authorization, as one of the codefendants in Bowman, a British national, was not before the Court. Id. at 102-03, 43 S.Ct. at 41. While this court writes off this distinction as “irrelevant,” Op. at 1346, the distinction substantially weakens the strength of the inference that can be drawn from “context.” The prudential concerns behind the canon against extraterritoriality, in light of the Supreme Court’s subsequent instruction, counsel against expanding the Bowman rationale to non-citizens. Even were nothing to prevent Congress from criminalizing acts by foreign nationals abroad, Bowman is instructive about which inferences are reasonable to draw, and it is reasonable to infer that Congress is more likely to assert jurisdiction over its own citizens abroad than over foreign nationals abroad, given the jurisdictional and foreign policy implications of such a step.
The different nature of the offenses at issue further undermines the analogy to Bowman. The rationale behind Bowman was that some crimes, such as defrauding the United States government, because they directly harm the United States government in a manner “not logically dependent on their locality,” 260 U.S. at 98, 43 S.Ct. at 41, are such that it is obvious that in declaring them to be crimes Congress intends to prohibit them everywhere. While this may be true of a class of crimes such as terrorism against American targets, see United States v. Yousef, 327 F.3d 56, 86 (2nd Cir.2003), or the murder of United States agents abroad, see United States v. Felix-Gutierrez, 940 F.2d 1200, 1204-05 & n. 8 (9th Cir.1991), the offenses charged against Garcia and his two code-fendants under 8 U.S.C. § 1324 are of a different character. The harm that § 1324 prevents is the unauthorized entry of aliens into the United States, which is quite “logically dependent on [its] locality.” Bowman, 260 U.S. at 98, 43 S.Ct. at 41. Extraterritorial predicate acts occurring thousands of miles from the United States such as those charged here harm the United States only by a far more attenuated causal chain, by making it more likely that, at some point in the future, unauthorized aliens may attempt illegal entry into the United States.
*1355 In Bowman and cases like Yousef and Felix-Gutierrez, courts have departed from the presumption against extraterritoriality only because a crime (such as a terrorist attack or the murder of a United States agent) would harm the United States government even if it was completed abroad. Given the nature of the crime, the courts inferred that Congress must have intended to protect the United States government from harm irrespective of its origin. The less direct and the less immediate the harm to the United States from extraterritorial conduct is, the weaker this inference becomes, and the more likely it is that Congress would consider countervailing factors to outweigh any interest in extraterritorial application. Congress might adopt, on a legislative record more complete than the one now before the court, the court’s conclusion that extraterritorial application of 8 U.S.C. § 1324 is required to safeguard United States borders more effectively. See Op. at 1345. But the necessity of such an approach calls for a policy conclusion that is hardly so obvious that the court can attribute it to Congress solely on the basis of the offenses at issue here, as it can where the harm is direct and immediate. The extraterritorial conduct of Garcia and his two codefendants ended in Guatemala over 2,500 miles from the United States and over 100 miles from Mexico, where the migrants intended to travel. Under the circumstances, there is not enough to warrant a departure from the “longstanding principle of American law” that statutes only apply domestically “unless a contrary intent appears.” Arabian American Oil Co., 499 U.S. at 248, 111 S.Ct. at 1230.
II.
The requirement of “affirmative evidence” that the Supreme Court set forth in Sale, 509 U.S. at 176, 113 S.Ct. at 2561, rather than this court’s looser “contextual reasons for reading the text otherwise” test, see Op. at 1344, compels the conclusion that neither 8 U.S.C. § 1324(a)(1)(A)® nor (a)(l)(A)(iv) applies extraterritorially, nor, by extension, does the conspiracy offense in (a)(l)(A)(v). While the statute can be read to reach predicate acts in foreign countries that could eventually lead to the entry of undocumented aliens into the United States, it is equally plausible from the text of the statute and the policies behind it that Congress had a less ambitious enforcement scheme in mind. This latter possibility is confirmed by the history of the attempt provision in the illegal bringing offense, 8 U.S.C. § 1324(a)(1)(A)®, which was meant to do no more than ensure that persons transporting unauthorized aliens to the United States would not be absolved from liability by an immigration official’s refusal, upon arrival, to let the aliens enter. As to the encouragement/inducement offense, 8 U.S.C. § 1324(a)(l)(A)(iv), Congress has been silent as to extraterritoriality, and absent a clear statement from Congress or any jurisdictional limits, the purpose behind the canon against extraterritoriality counsels against reading the statute to have such breadth.
A.
The plain text of § 1324 contains no affirmative statement that the acts it forbids are also forbidden when they occur in other nations or on the high seas. This absence alone is meaningful, although not entirely fatal. The presumption against extraterritoriality, while strong, does not quite have the force of a clear statement rule; the Supreme Court in Sale consulted legislative history when the provision of the INA at issue contained no clear statement of Congress’ desire to apply it outside the United States. See Sale, 509 U.S. at 174-77, 113 S.Ct. at 2560. It is instruc *1356 tive, however, that in the context of preventing the entry of illegal drugs into the United States, a subject that raises similar policy questions about the extent to which the United States wishes to protect its borders by preemptively extending its laws into the high seas or other countries, Congress has criminalized extraterritorial acts on the face of the relevant statute. See Maritime Drug Law Enforcement Act, Pub.L. No. 96-350 (1980) (codified as amended at 46 U.S.C. app. §§ 1901-04 (2004)) (“Maritime Drug Act”). The Maritime Drug Act is an example of what a statute looks like when Congress intends to apply it extraterritorially: it contains an express provision dictating that it “is intended to reach acts ... committed outside the territorial jurisdiction of the United States,” § 1903(h); it provides for the jurisdictional limit that it does not apply to foreign nationals on the vessels of foreign nations that do not consent to the enforcement of U.S. law, § 1903(a); and it provides jurisdiction and venue rules for defendants subsequently brought into the United States to stand trial, § 1903(f). By contrast, 8 U.S.C. § 1324 contains none of these elements. The court casts the Maritime Drug Act aside, speculating that Congress was addressing a less “outward-looking” statute than a border control statute, see Op. at 1348-49, but this distinction is hardly persuasive. The “natural inference,” cf. Op. at 1345, of a statute specifically aimed at maritime drug interdiction would presumably be that it applies on the high seas, yet Congress still thought it necessary to specify that the statute has extraterritorial application. 49 U.S.C. app. § 1903(h).
Nor are the criminal offenses in 8 U.S.C. §§ 1324(a)(l)(A)(i) and (a)(l)(A)(iv) of such character as to cause a logical inference that they must take place abroad. The title of § 1324, “bringing in and harboring certain aliens,” as well as the substantive offenses in (a)(l)(A)(i) (“bringing”), (a)(l)(A)(ii) (“transporting] ... within the United States”), and (a)(l)(A)(iii) (“harboring] or shielding] from protection”) imply the opposite, as one generally cannot “bring[ ] in,” “bring ... to the United States,” “transport ... within the United States,” or “harbor” aliens without also being in the United States oneself. The only substantive offense that it is possible to commit outside of the United States is the encouragement/inducement offense in (a)(l)(A)(iv). Yet it is equally possible to commit the same acts domestically, such as by advertising the availability of jobs for undocumented immigrants or by telephoni-cally inviting foreign acquaintances illegally to join the inducer in the United States. While Congress could have wanted to criminalize both, the text of (a)(l)(A)(iv) does not dictate such a conclusion.
To overcome this difficulty, the court finds an implicit command of extraterritorial application in the inchoate offense of attempted bringing in (a)(l)(A)(i) (“attempt[ing] to bring to the United States”). The court offers three reasons for this reading, the first textual, the second intra-textual, the third rooted in policy; none is persuasive. The textual argument, which reasons that “attempts” usually occur abroad because they become completed crimes upon the aliens’ entry into the United States, see Op. at 1346-47, ignores the fact that attempts that fail at the border or in territorial waters have entered the territorial jurisdiction of the United States without completing the substantive crime. Aliens intercepted at the border or in territorial waters have not, for many legal purposes, entered the United States. The Supreme Court explained in Sale:
Under the INA, both then and now, those seeking “admission” and trying to avoid “exclusion” were already *1357 within our territory (or at its border), but the law treated them as though they had never entered the United States at all; they were within United States territory but not “within the United States.”
509 U.S. at 175, 113 S.Ct. at 2560. While the attempt provision in § 1324(a) (1) (A) (i) is open to the court’s reading, it can just as plausibly refer to instances where an attempt to bring undocumented aliens into the United States fails because the aliens are intercepted at the border or in territorial waters (if the attempt involves surreptitious entry), or refused entry by immigration officials (if the attempt involves fraudulent entry). While the record does not contain any statistics about United States border control efforts, such interdiction at the border would seem to be the place where many attempts fail that subsequently become the basis for (a)(l)(A)(i) prosecutions. Because the plain text of (a)(1)(A)® is amenable to either reading, it is not “affirmative evidence” of extraterritorial application.
The court’s second, intra-textual argument finds a command of extraterritorial application in the forfeiture provisions at 8 U.S.C. § 1324(b)(1), which authorize seizure of “any vessel ... being used in the commission of a violation of subsection (a).” See Op. at 1347-48. The court reasons that (b)(1) applies extraterritorially, and therefore (a) must as well, for otherwise the two subsections are not in harmony. See Op. at 1347-48. But that reasoning is circular; by its plain terms, (b)(1) only applies to a vessel “being used in the commission of a violation of subsection (a)”; in other words, (b)(1) only applies extraterritorially if (a) does, and vice ver-sa. Moreover, (b)(1) has a perfectly sensible meaning if (a)(1)(A)® applies only territorially: it authorizes seizure of vessels intercepted in territorial waters, vessels in port where immigration officials detect illegal entrants as they disembark, and, arguably, vessels intercepted on the high seas in connection to a conspiracy that extends into the United States. It is not surprising that the forfeiture provisions would be limited to property otherwise within United States jurisdiction. Section (b)(1) counsels against, not in favor of, extraterritorial application of (a)(1)(A)(i). The consequence to (b)(1) of reading (a)(1)(A)® extraterritorially highlights the dangers of disregarding the canon against extraterritoriality. Because this court’s reading leaves the statute with no jurisdictional limits, it would authorize the seizure and forfeiture of foreign property within or subject to the jurisdiction of other countries — such as, for instance, the seizure of a ship flying a foreign flag on the high seas, or even within the territorial waters of a foreign country. To say that this creates “conflict with the laws of other nations,” Sale, 509 U.S. at 174, 113 S.Ct. at 2560, not to mention with international treaties to which the United States is a signatory, see, e.g., Convention on the Law of the Sea, April 29, 1958, 13 U.S.T. 2312 (entered into force Sept. 30, 1963), would be an understatement.
The court’s third, policy-based argument is that because “the terrorist attacks of September 11, 2001” remind us that “border-control policies are of crucial importance to [] national security and foreign policy,” the 1903 Congress that enacted the provision must have intended it to reach extraterritorially in order to protect the United States’ borders. Op. at 1345. Congress could, of course, adopt the same policy conclusion and decide that criminalizing extraterritorial predicate acts (such as, in the instant case, covert travel to Guatemala) is a necessary component of border control. But an important purpose behind the presumption against extraterritoriality is that such decisions are to be *1358 made by Congress, and not the courts. The record before the court contains nothing to support the premise that territorial enforcement of the statute would be so inadequate that Congress could not have intended it; for example, there is no evidence on which to evaluate the relative effectiveness of different mechanisms of immigration enforcement, such as how heavily immigration authorities rely on interdiction in foreign countries rather than at the United States border, or on interdiction on the high seas vis-a-vis in territorial waters; nor is there any evidence on whether interdiction on the high seas subject to some other authority, without the threat of criminal sanctions, is significantly less effective than interdiction with that threat. The court’s failure to cite even one case in which § 1324(a)(l)(A)(i) has been applied extraterritorially undercuts its apparent fear that border control will be undermined by failure to do so.
The unusual circumstances underlying the indictments at issue hardly suggest that extraterritorial enforcement of § 1324 plays an integral role in United States border control. The Jose Alexander II was not intercepted in United States waters, or close to such waters and or headed towards them, but was rather intercepted off the southern coast of Guatemala, over two thousand five hundred miles from the United States, en route from Ecuador to Guatemala. Nothing in the record suggests that the Coast Guard deems it necessary or even useful to patrol waters so distant from United States shores to detect alien smuggling. The United States vessel that spotted and intercepted the Jose Alexander II was not a Coast Guard vessel but a Navy destroyer, the U.S.S. Fife, that had a Coast Guard Law Enforcement Detachment on board. The Coast Guard’s involvement was initially humanitarian, for purposes of providing food and water to the migrants and ensuring their safety in reaching shore in Guatemala. Only after the Jose Alexander II reached Guatemala did interviews with the passengers reveal circumstances that led to the criminal charges under § 1324.
Moreover, the court’s attempt to read post-September-llth immigration policy into 8 U.S.C. § 1324 runs aground on the legislative history of the attempt provision in the illegal bringing offense. That history shows that Congress’ addition of the attempt provision was meant to do nothing more than ensure that those involved in transporting illegal aliens to the United States would not be absolved from criminal liability because an immigration official ultimately denied the aliens entry into the country. The “bringing” offense, currently codified at § 1324(a)(1)(A)(i), originated in § 6 of the 1891 Immigration Act, Act of March 3, 1891, ch. 551, 26 Stat. 1084 (1891), which made it a misdemeanor to “bring into or land in the United States by vessel or otherwise, or [ ] aid to bring into the United States ... any alien not lawfully entitled to enter.” This 1891 provision, because it required completion of the offense, quite plainly did not apply extrater-ritorially. The attempt provision was inserted by the 1903 Immigration Act, Act of March 3, 1903 ch. 1012; Pub.L. No. 57-162; 32 Stat. 1213. The House Report to the 1903 Act explains that Congress amended the provision to:
substitute] the word “attempt” for “aid,” the courts having held that the word “aid” involved the actual landing of the prohibited alien. Since such an alien is rejected, the provision must be amended or remain, as it has been since the decision ... [,] a dead letter.
H.R.Rep. No. 57-982 at 4 (1902) (emphasis added). In other words, Congress was responding to court decisions holding that persons who brought aliens not entitled to enter the United States could not be held *1359 liable under the initial wording of § 6 when those aliens were denied entry by immigration officials. Id. There is nothing to suggest that the 1903 substitution of the term “attempt” for “aid” was intended to expand the bringing offense extraterri-torially; the amendment was only to ensure that the criminal provision would apply even when “such an alien is rejected,” id., i.e., when, upon reaching the United States, the alien is denied entry. When Congress enacted the Immigration and Nationality Act of 1952, ch. 477, Pub.L. No. 82-414 (1952), 66 Stat. 163, which consolidated existing immigration statutes and relocated the bringing offense to § 1324 of the United States Code, Congress described the 1903 amendment, which inserted the attempt provision, only as intended “primarily to codify existing law.” H.R.Rep. No. 82-1365 at 14 (1952).
When § 6 of the 1903 Act was recodi-fied, with minor changes, as § 8 of the 1917 Immigration Act, ch. 29, Pub.L. No. 64-301; 39 Stat. 874, to prohibit “any person, including the master, agent, owner, or consignee of any vessel” from “bringing] into or landing] in the United States, by vessel or otherwise, or [] attempting], by himself or through another, to bring into or land in the United States” any undocumented alien, nothing indicates that Congress intended to expand the scope of the original 1891 law or the 1903 amendment. Further, in 1933, when the United States prosecuted an alien smuggler intercepted on the high seas on the theory that he had attempted to bring unlawful aliens into the United States, the Ninth Circuit, in Yenkichi Ito v. United States, 64 F.2d 73 (9th Cir.1933), held that § 8 did not apply extraterritorially and dismissed the indictment. Not surprisingly, Congress nowhere tried to correct or express disagreement with the Yenkichi Ito decision, which comported with Congress’ expressed intent in enacting the 1903 amendment.
The Supreme Court explained in Johnson v. Transp. Agency of Santa Clara Cty., 480 U.S. 616, 629 n. 7, 107 S.Ct. 1442, 1450 n. 7, 94 L.Ed.2d 615 (1987), that although Congressional “inaction” in the face of a judicial construction of a statute “may not always provide crystalline revelation,” that “should not obscure the fact that it may be probative to varying degrees.” By virtue of the Ninth Circuit’s geography, Yenkichi Ito has been the law in every state and territory having contact with the Pacific Ocean for over seventy years. If Congress had thought it necessary that the attempted bringing offense apply extraterritorially so as to make it possible to intercept alien smugglers on the high seas, it would, particularly if it had shared this court’s fear, have corrected a decision that removed one of two neighboring oceans from the statute’s reach. While the court observes that other circuits, in cases such as Claramont v. United States, 26 F.2d 797 (5th Cir.1928) (per curiam), have upheld the extraterritorial application of the encouragement/inducement offense, see Op. at 1350, the inducement offense, unlike the attempted bringing offense, bears no obvious nexus to the high seas or maritime interdiction. Yenkichi Ito is the only case to decide whether the attempted bringing offense under (a)(l)(A)(i) applies extraterritorially, and its interpretation has been binding over a very large geographic area for a very long time and never changed by Congress.
Congress has not acted to correct the interpretation in Yenkichi Ito, moreover, despite being informed by the Justice Department that it considered itself bound not to prosecute the attempted bringing offense extraterritorially. When Congress revised § 1324(a) in the Immigration Re *1360 form and Control Act of 1986, Pub.L. No. 99-603, 100 Stat. 3381, the Justice Department urged Congress to retain the encouragement/inducement offense, which the Department claimed had “proven to be a useful tool in combatting [sic] alien smuggling” and “the only provision ... that has extra-territorial application.” See H.R.Rep. No. 99-682, pt. 1, at 112 (1986). The Department thus put Congress on notice that the Department would not prosecute the attempted bringing offense outside of the United States. Despite amending (a)(1)(A)© to correct other court decisions not at issue here, Congress took no action with respect to (a)(l)(A)(i)’s extraterritorial application. Congress’ silence on extraterritorial application of § 1324(a)(1)(A)©, when confronted with both the Yenkichi Ito decision and the Justice Department’s 1986 representation, is deafening.
There are, admittedly, fewer indications of Congressional intent with respect to the encouragement/inducement offense in 8 U.S.C. § 1324(a)(1)(A)(iv), which, on its face, is consistent with or without a territorial limitation. The offense originated in §§ 5-7 of the 1917 Immigration Act, which contemplated that some prohibited encouragements such as “advertisements printed, published, or distributed in any foreign country,” § 6, would occur abroad. It is unclear from the face of the 1917 statute or the contemporaneous legislative history, however, whether such extraterritorial acts would also trigger liability for a foreign national who never set foot in, or accompanied any unlawful aliens into, the United States. The prohibitions on “solicit[ing] the importation or migration of any day laborer” in § 5, and “soliciting or attempting to induce, assist, encourage, or solicit any alien to come into the United States by promise of employment” in § 6 both imply that Congress’ concern was primarily with domestic employers. The civil penalties in § 7 of the Act that related to those “engaged in the business of transporting aliens to or within the United States” became operative only upon a determination that the defendant “ha[d] brought or caused to be brought to a port of the United States any alien so solicited,” id. § 7, although the criminal penalties under § 7 are the same as those for employers under § 5 and are similarly silent as to when liability is triggered. Again, the 1952 Immigration and Nationality Act, which consolidated these offenses into the generic encouragemenVinducement offense currently codified at § 1324(a)(l)(A)(iv), provides no indication that the simplification and consolidation was intended to effect a significant change in their operation.
Nothing about an encouragemenVin-ducement provision with a territorial limitation would be illogical. Most such acts, as the court acknowledges, see Op. at 1347-48, presumably occur abroad, but that cuts against, not in favor of, extraterritorial application: there are likely few migrants who are not encouraged or induced by some third party to make the journey to the United States before they emigrate from a foreign country. Congress could have reasonably concluded that inducements by persons already in the United States, such as employers promising jobs (as, historically, was the principal concern in 1917), or residents urging friends and family members to join them here, pose a greater threat than encouragement by foreign nationals abroad, because the former are more likely to provide specific destinations and credible promises of support and concealment upon arrival. Or Congress could have concluded, as it did in the Maritime Drug Act, 46 U.S.C. app. § 1903(a), that jurisdictional and foreign policy concerns weigh against criminalizing activity by foreign nationals in foreign jurisdictions, particu *1361 larly, as here, where the crime can consist of mere speech and is likely exceedingly common.
The combination of a statutory text that permits but does not require extraterritorial application and a silent legislative history is not enough of a basis for a court to decide to apply the encouragement/inducement offense in § 1324(a)(1)(A)(iv) beyond the territorial jurisdiction of the United States. Courts “assume that Congress legislates against the backdrop of the presumption against extraterritoriality.” Arabian American Oil Co., 499 U.S. at 248, 111 S.Ct. at 1230. As the Supreme Court instructed in Sale, in refusing to consider a particular amendment to the Immigration and Nationality Act sufficient evidence of Congress’ intent to extend the law extraterritorially, the possibility that Congress “might have intended” such a result “is not a substitute for the affirmative evidence of intended extraterritoriality that our cases require.” 509 U.S. at 176, 113 S.Ct. at 2561. See also Empagran, — U.S. at-, 124 S.Ct. at 2366; Arabian American Oil Co., 499 U.S. at 250, 111 S.Ct. at 1231.
B.
By departing from well-established Supreme Court precedent against reading statutes to apply extraterritorially absent “affirmative evidence,” the court’s holding on 8 U.S.C. § 1324 stands alone. Other circuit courts of appeal have upheld convictions for extraterritorial encouragement and inducement where the alien ultimately entered the United States, see United States v. Nunez, 668 F.2d 10, 12-13 (1st Cir.1981) (per curiam); United States v. Castillo-Felix, 539 F.2d 9, 12-13 (9th Cir1976); United States v. Williams, 464 F.2d 599, 601 (2nd Cir.1972), and in dictum observed the extraterritorial application of the attempted bringing offense where a vessel is intercepted in United States waters. See United States v. Liang, 224 F.3d 1057, 1060 (9th Cir.2000). Likewise in Claramont, 26 F.2d 797, relied on by the court, see Op. at 1350, the alien who was induced actually entered the United States. See Emmanuel v. United States, 24 F.2d 905 (5th Cir.1928); Smith v. United States, 24 F.2d 907 (5th Cir.1928). But no other circuit court has previously upheld an indictment under the encouragement/inducement charge, § 1324(a)(1)(A)(iv), where, as here, the inducement takes place abroad and the alien never reaches the United States, or under the attempted bringing charge, § 1324(a)(1)(A)®, where, as here, no aspect of the attempt ever reaches the United States. There are no cases on point from other circuit courts of appeal regarding the encouragement/inducement offense, and the only case on point regarding the attempted bringing offense, Yenkichi Ito, 64 F.2d 73, rejects the court’s interpretation.
The breadth that the court reads into 8 U.S.C. § 1324 should not be understated. While the conduct at issue in this particular case occurred on the high seas, nothing in the statute, once untethered from any territorial limit, confines it to maritime interdiction. Presumably, the guide who covertly helps migrants from Ecuador into Colombia (so that they can eventually reach the United States) could be guilty of conspiracy to violate § 1324(a)(1)(A)®; the Ecuadorian mother who convinces her son to make the illegal voyage to the United States so that he can send back money to support the family living abroad could be guilty of violating § 1324(a)(l)(A)(iv). The point is not that Congress could not, subject to the limitations of the Fifth Amendment, see United States v. Davis, 905 F.2d 245 (9th Cir.1990), criminalize such conduct (or that the United States would care to enforce the statute against *1362 minor participants), but rather that absent a territorial stopping point, the breadth of the statute becomes staggering. The court’s confidence that prosecutorial discretion and diplomatic skill will smooth over such difficulties, see Op. at 1350-51, is not particularly reassuring or relevant: if the Supreme Court thought Executive Branch expertise were the solution to problems arising from the unintentional application of United States law abroad, there would be little need for a canon against extraterritoriality.
Indeed, the lack of jurisdictional limits in 8 U.S.C. § 1324 should be a warning that Congress did not contemplate extraterritorial application. As noted, Congress’ approach to preempting the importation of illegal drugs in the Maritime Drug Act, 46 U.S.C. app. §§ 1901-04 (the law the U.S.S. Fife was likely enforcing when it happened upon the defendants’ vessel), is instructive. In that Act, Congress expressly extended its reach to vessels on the high seas, but limited it to vessels subject to the jurisdiction of the United States, stateless vessels, vessels of consenting nations, and United States citizens and resident aliens on board any vessel. Id. § 1903(a); cf. United States v. Gonzalez, 311 F.3d 440 (1st Cir.2002). Congress thus drew a line, based on its judgments about foreign relations and international law, that it would not criminalize acts by foreign nationals on the vessels of foreign nations without such nations’ consent. This is precisely what the presumption against extraterritorial application serves to ensure: that Congress consider such factors and draw such lines, and that the judiciary, lacking foreign policy expertise, respect these considerations by erring against finding extraterritorial application in unclear statutes. The Supreme Court’s decision this Term in Empagran, — U.S. at -, 124 S.Ct. at 2366, could not be clearer on this point.
In sum, the court’s interpretation, which criminalizes acts irrespective of location, jurisdiction, or the nationality of the defendant, absent any indication that Congress gave such factors consideration, fails to heed the prudential interests the canon safeguards. Both through the substantive offenses and inchoate crimes, application of 8 U.S.C. § 1324 extraterritorially criminalizes a wide range of conduct that is legal in the countries in which it occurs, including a great deal of travel and speech. The court’s holding allows 8 U.S.C. § 1324, where Congress was silent about extraterritoriality, to reach, paradoxically, much further into the jurisdiction of other countries than the closely analogous Maritime Drug Act, in which Congress expressly proclaimed its intention to apply the statute abroad. It is unlikely that Congress ever intended such a dichotomous outcome, and “context” alone cannot provide the requisite indication of Congressional intent as required by the Supreme Court. Because Congress has not “clearly expressed” that the offenses charged in the indictment under 8 U.S.C. § 1324 are to apply extraterritorially, Arabian American Oil Co., 499 U.S. at 248, 111 S.Ct. at 1230 and the government fails to offer evidence to overcome the presumption against extraterritoriality of statutes, and because the government has waived any waiver claim it might have against the statutory challenge, see concurring opinion of Judge Randolph, the indictments should have been dismissed. Accordingly, I respectfully dissent.