# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-3060

IN RE:

ALI HIJAZI,

*Petitioner*.

On Petition for a Writ of Mandamus to the
United States District Court for the Central District of Illinois.
No. 05-40024—**Joe Billy McDade**, *Judge.*

ARGUED NOVEMBER 4, 2008—DECIDED DECEMBER 11, 2009

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* The complexities inherent in transnational criminal law enforcement can be vexing: ordinary tasks like securing the presence of the defendant, collecting evidence, and enforcing a judgment are transformed into hurdles that are difficult, or impossible, to pass. This case illustrates the problem well. Ali Hijazi is a Lebanese citizen and a resident of Kuwait. In March 2005, he was indicted in the Central District of Illinois on various fraud-related charges. Hijazi has never appeared in Illinois, however, and there is no extradition treaty between the United States and Kuwait

that would enable the United States to secure his presence. Indeed, the matter is worse than that: the Kuwaiti government has informed the court that it does not intend to turn Hijazi over voluntarily.

With the assistance of U.S. counsel, Hijazi has moved to dismiss the indictment against him. He would like to present a number of significant legal issues to the district court, including the following: (1) construing the major fraud statute, 18 U.S.C. § 1031(a), and the wire fraud statute, 18 U.S.C. § 1343, to cover his conduct, all of which took place in Kuwait in dealings with Kuwaiti entities, would violate international law; (2) the U.S.-Kuwait Defense Cooperation Agreement bars the United States district court from exercising criminal jurisdiction over him; (3) the long delay (now approaching five years) in bringing him to trial is the government's responsibility, and it violates his right to a speedy trial; (4) the exercise of jurisdiction over him would violate due process; and (5) the indictment should be dismissed for want of prosecution. The government, not surprisingly, vigorously defends the assertion of territorial jurisdiction over Hijazi, arguing that he and his co-defendant took action in furtherance of their fraud in the United States and against the United States, and that the prosecution is not otherwise barred.

Hijazi's problem is that matters have reached an impasse in this case. The district court refuses to rule on his motions to dismiss the indictment until he appears in person and is arraigned, and Hijazi takes the position that, in the absence of an extradition treaty or any other

source of law, he is under no legal obligation to travel to the United States and to submit himself to the authority of the district court. The government appears to be resigned to this impasse. We conclude that, under the unusual circumstances of this case, the district court had a duty to rule on Hijazi's motions to dismiss. Hijazi has also asked this court to rule on the merits of his motions, and in order to assess both the petition for a writ of mandamus and that request, we requested and have received supplemental briefing on the merits. We have concluded, however, that the district court, which presided over the case against Hijazi's co-defendant Jeff Alex Mazon, is in a better position to address the merits in the first instance, and so we decline that invitation.

# I

## A

We take the following account of the facts underlying this prosecution from the Supplemental Brief for the United States; this allows us to present the allegations against Hijazi in enough detail to provide context for the mandamus petition. Where it appears to be helpful, we have supplemented this account with assertions from Hijazi's briefs. We naturally do not vouch for any particular allegation of either party.

In late 2001, the U.S. Army contracted with Kellogg Brown & Root ("KBR"), a U.S. company, to provide both goods and services to the military at locations through-

out the world, including in Kuwait. Mazon, an American, was the procurement manager for KBR stationed in Kuwait. Among other things, he was responsible for hiring subcontractors to perform work under KBR's contract. The Army concluded that it needed fuel tankers and related services at the Kuwaiti airport, which it used for military operations. Mazon accordingly solicited bids for the tankers in early 2003; KBR anticipated that the cost would be about $685,000. Two bidders responded: one was Hijazi, who submitted a bid for 507,000 Kuwaiti Dinars (approximately $1,673,100) on behalf of his company, LaNouvelle General Trading & Contracting Co., a Kuwaiti company with no American ownership interests; the other is referred to only as Company A, which bid 573,300 Kuwaiti Dinars (approximately $1,891,890).

Mazon pushed the prices up more than threefold, so that LaNouvelle's bid became $5,521,230, and Company A's bid $6,243,000. So "adjusted," Mazon then awarded the contract to LaNouvelle. The government alleges that he did so with the understanding that Hijazi would "reward" him for his efforts. Mazon and Hijazi signed the subcontract in Kuwait. Around the same time, Mazon sent four emails relating to the subcontract to KBR managers in the United States. Then, from March to August 2003, LaNouvelle submitted allegedly inflated invoices to KBR for its work, and KBR paid the anticipated $5,521,230. After paying LaNouvelle, KBR turned around and billed the United States for reimbursement; the Army complied, using checks and wire transfers. LaNouvelle itself had no direct dealings with the U.S. Army or the U.S. government.

In September 2003, Hijazi paid Mazon $1 million and executed a promissory note to make it appear that this represented a loan. Later, however, Hijazi sent an email to Mazon, to an account based in the United States, in which he wrote "this whole lown [*sic*] (principal & interest) totally your money . . . ." Mazon himself, however, was not in the United States at that time. He was living and working in Greece during the relevant period, and that was where he received this email from Hijazi. In October 2003, back in the United States, Mazon opened a bank account where he unsuccessfully tried to deposit the $1 million. When that did not work, Hijazi emailed Mazon again (this time at his personal account, also allegedly based in the United States), instructing Mazon to open three different offshore accounts where he could deposit the money. Hijazi represents that Mazon opened this email in Greece as well. Mazon, however, tried again to deposit the funds in a different U.S. bank, on October 28, 2003. It is unclear whether the second bank was more accommodating. Two weeks later, after he was interviewed by a KBR investigator, Hijazi sent a third email to Mazon warning him to be careful about what he said to his "ex-friends in Kuwait." The government alleges that Mazon was back in the United States at the time he received this email.

B

Based on these facts, Hijazi and Mazon were indicted in the Central District of Illinois; the initial indictment was returned in 2005, and the Second Superseding Indict-

ment was filed on August 3, 2006. Following his indict-
ment, Hijazi surrendered voluntarily to Kuwaiti authori-
ties, posted a $1,800 bond, and was released. As noted
earlier, there is no extradition treaty between the United
States and Kuwait. Although the Department of Justice
formally asked the Kuwaiti authorities to turn Hijazi
over to it, through a diplomatic note dated September 13,
2005, Kuwait has refused to grant that request. All indica-
tions in the record continue to support the conclusion
that the Government of Kuwait is unwilling to cooperate
in this prosecution, insofar as it concerns Hijazi. There
are three letters, dated May 3, 2007, August 22, 2007, and
March 3, 2008, from Salem Abdullah Al-Jaber Al-Sabah,
Ambassador from Kuwait to the United States, firmly
objecting to it. For example, the following passage
appears in Ambassador Al-Sabah's March 3, 2008, letter:

> . . . [W]e strongly believe that the underlying facts do
> not support the indictment. Second, we do not
> believe the United States has any basis for asserting
> legal jurisdiction over Mr. Hijazi for acts alleged to
> have taken place in Kuwait. Numerous letters from
> our Government to [the Department of Justice] and
> meetings with Departmental officials hopefully have
> made our position on the sovereignty issue very clear.

To the extent that crimes have been committed in a trans-
action that Kuwait sees as one between two private
companies operating in Kuwait, criminal jurisdiction
(according to the Ambassador) lies in Kuwait. The letter
concludes with this statement: "I formally and respectfully
request that this case be discontinued now or, at the very

least, that the Department of Justice consent to the Court's ruling on the motion even though Mr. Hijazi remains in Kuwait."

In the meantime, the government has proceeded with its prosecution of Mazon. The result of the first trial in Mazon's case, which was held in April 2008, was a mistrial; the same result ensued in the re-trial, which took place in October 2008. On March 24, 2009, the government and Mazon entered into a plea agreement whereby Mazon agreed to plead guilty to a single misdemeanor count of making a writing containing a false statement, in violation of 18 U.S.C. § 1018. For its part, the government agreed to dismiss all charges against Mazon in the pending case, including all fraud charges. The plea agreement does not require Mazon to testify against Hijazi or otherwise to cooperate in that part of the original case. Hijazi argues that this action forecloses the government's theory that he and Mazon were co-schemers in a fraud conspiracy; the government insists that it does no such thing and that it "stand[s] ready to try Hijazi should he submit to the court's jurisdiction or be intercepted by authorities."

Shortly after the first indictment was returned, Hijazi filed a motion to dismiss, arguing that the statutes under which he was charged do not apply, and constitutionally cannot apply, to the conduct of foreign nationals outside the boundaries of the United States. The government filed a motion to strike, and the district court referred the motion to a magistrate judge. The magistrate judge recommended that Hijazi's motion be denied,

reasoning that he was a fugitive and thus, under the fugitive disentitlement doctrine of *Molinaro v. New Jersey*, 396 U.S. 365 (1970), he was not entitled to have his motion considered. The magistrate judge also expressed a concern that there was no "mutuality" in Hijazi's motion: if it was granted, then Hijazi would win, but the magistrate judge saw "nothing to indicate that an unfavorable decision would be followed by an appearance of the defendant to defend against the indictment."

On *de novo* review of the Report and Recommendation, the district court began by noting that it had discretion to dismiss an indictment prior to arraignment, under *Hughes v. Thompson*, 415 U.S. 1301 (1974). The district court was not persuaded, however, that the fugitive disentitlement doctrine applied directly to Hijazi. It pointed out that "Hijazi has not yet been convicted of a crime, Hijazi has never been physically present within the jurisdiction of this Court, and he has submitted to Kuwaiti authorities." On the other hand, the court found that the policies behind the doctrine retained some force—in particular, "the desire for mutuality in litigation." Like the magistrate judge, the district court thought that "Hijazi has little to lose—if anything—from an unfavorable ruling on his motion." The court thus decided not to render a decision on Hijazi's motion until he is arraigned; the court recognized that Hijazi would be entitled to a ruling if and when he appeared.

Hijazi filed a second motion to dismiss on December 21, 2007. The district court took no action until September 4, 2008, when it issued an order clarifying that Hijazi's

second motion to dismiss was also being held in abeyance, largely for the reasons the court had already given. In the meantime, on August 13, 2008, Hijazi filed his petition for a writ of mandamus with this court. We now turn to the merits of that petition.

## II

Despite the breadth and importance of the issues implicated by Hijazi's motions to dismiss the indictment, the question before us is a narrow one: is he entitled to a ruling at this time, or must he voluntarily travel to the United States and present himself for arraignment before the court takes his motions under advisement? Put simply, does the district court, under the circumstances of this case, have a duty to rule now on the authority of the United States to apply its law to Hijazi's conduct? In his original petition, Hijazi also requested, almost in passing, that this court itself order the district court to dismiss the indictment on the merits. We ordered supplemental briefing on that question, as we have already noted, and we appreciate the additional insight into the case that those briefs have afforded.

This court is authorized to issue a writ of mandamus pursuant to 28 U.S.C. § 1651(a), the All Writs Act. See also FED. R. APP. P. 21. This writ is available in the federal courts only in extraordinary circumstances, either "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 35 (1980) (internal quotation

marks omitted). The Supreme Court's most recent treatment of this topic appears in *Cheney v. United States Dist. Court,* 542 U.S. 367 (2004). There, noting that "the writ is one of the most potent weapons in the judicial arsenal," the Court laid out the three conditions that must be satisfied before it may issue:

> First, the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process. Second, the petitioner must satisfy the burden of showing that [his] right to issuance of the writ is clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances. These hurdles, however demanding, are not insuperable. This Court has issued the writ to restrain a lower court when its actions would threaten the separation of powers by embarrass[ing] the executive arm of the Government or result in the intrusion by the federal judiciary on a delicate area of federal-state relations.

*Id*. at 380-81 (internal citations and quotation marks omitted). We address these points in turn.

1.   *Lack of adequate alternative remedy.* The longer this case has gone on, the more clear it has become that resolution of Hijazi's claims—and for that matter, resolution of the government's right to proceed with this case—will not be forthcoming through the usual procedures. Hijazi

is under no obligation to travel to the United States, and as long as he does not enter the country, he cannot forcibly be brought before the Central District of Illinois for his arraignment. As we have already noted, there is no extradition treaty between the United States and Kuwait, and so the Kuwaiti government is well within its rights to decide what it wants to do with Hijazi. See generally U.S. Dept. of State, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2009, at 158 (Kuwait), available at http://www.state.gov/documents/organization/123746.pdf (last visited Nov. 12, 2009) (referred to as "Treaties in Force"). The letters from the Ambassador leave no doubt about the Kuwaiti government's position: it objects to this prosecution, insofar as it involves Hijazi, and it is standing on its sovereign right to decline to cooperate with the United States.

As long as the indictment hangs over Hijazi, he is prejudiced even if he does not travel to the United States. He represents in his Supplemental Brief that the United States has directed INTERPOL, the international criminal police organization, to issue a "red notice" regarding Hijazi, which operates as a request to all 188 INTERPOL members to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the United States. See INTERPOL Notices, http://www.interpol.int/public/Notices/default.asp (last visited Nov. 12, 2009). This means, Hijazi asserts, that he is unable to travel home to Lebanon to see his family. (We note that there appears to be no extradition treaty between the United States and Lebanon either, see Treaties in Force at 160, but that does not mean

that he could travel there safely. Lebanon might choose to cooperate with a request from the United States, even in the absence of a treaty. Or Hijazi might stop *en route* in a country such as Egypt that does have such a treaty with the United States, see Treaties in Force at 79, and find himself seized for extradition.)

The government concedes that any harm suffered by Hijazi cannot be remedied by the regular appeals process, but, it says, any such harm is of Hijazi's own making. It urges that a writ of mandamus should not be available, because Hijazi can attain the relief he desires by showing up in court. But this reasoning overlooks the entire point of Hijazi's attack on the indictment. Hijazi was lawfully in Kuwait at the time of the indictment and remains so today. The government cites no support for the proposition that Hijazi has no right to stay there, and in that way, to refuse to cooperate with the U.S. proceeding. In fact, the reach of the statutes that Hijazi allegedly violated and the district court's authority to command his appearance are precisely the issues Hijazi wants the district court to resolve.

The government does not have the option, in the absence of Hijazi's consent, of proceeding *in absentia* with the entire proceeding. The Supreme Court held in *Crosby v. United States*, 506 U.S. 255 (1993), that FED. R. CRIM. P. 43 "prohibits the trial *in absentia* of a defendant who is not present at the beginning of the trial." *Id*. at 262. Nothing in *Crosby*, however, rules out what Hijazi is asking for: that is, a pre-appearance adjudication of the question whether the statutes in question apply

extraterritorially to his situation, as well as the question whether his actions were enough to draw him within the personal jurisdiction of the court. In fact, the district court's authority to render such a ruling is well established. It has jurisdiction over all offenses against the laws of the United States, see 18 U.S.C. § 3231, and a defendant charged with such an offense is entitled to—indeed, must—file a motion alleging "a defect in instituting the prosecution" or "a defect in the indictment" before trial, see FED. R. CRIM. P. 12(b)(3). Thus, even though ordinary proceedings do not provide an adequate alternative, Hijazi is asking for relief well within the power of the district court.

2. *Right to issuance of the writ.* The second criterion identified in *Cheney* is that the right to the issuance of the writ must be clear and indisputable. Under the unusual circumstances of this case, we conclude that this requirement has been met. First, Hijazi is attempting to raise fundamental questions about the legislative reach of the Major Fraud Act and the Wire Fraud Act. Whether we think of this as an issue relating to legislative jurisdiction, see, *e.g., Jones v. United States,* 529 U.S. 848 (2000) (evaluating interstate commerce issue under arson statute, 18 U.S.C. § 844(i), as question of statutory coverage); *Hartford Fire Ins. v. California,* 509 U.S. 764, 800 (1993) (Scalia, J., dissenting), or as something going to the court's very power to act, there is no doubt that the question of how far a statute reaches out to address conduct undertaken outside the United States, in whole or in part, is a fundamental one. See also Brief for the United States as Amicus Curiae, *Morrison v. Nat'l Australia*

*Bank Ltd.,* No. 08-1191 (U.S. Oct. 27, 2009) (addressing the extraterritorial reach of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and arguing that the links to the United States in that case were too attenuated to support a private suit, as a matter of statutory coverage).

The Supreme Court's decision in *F. Hoffman-La Roche Ltd. v. Empagran,* 542 U.S. 155 (2004), emphasizes the importance and delicacy of the general issue that we face here:

> . . . [T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations. See, *e.g.,* *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20-22 (1963) (application of National Labor Relations Act to foreign-flag vessels); *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382-383 (1959) (application of Jones Act in maritime case); *Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953) (same). This rule of construction reflects principles of customary international law—law that (we must assume) Congress ordinarily seeks to follow. See Restatement (Third) of Foreign Relations Law of the United States §§ 403(1), 403(2) (1986) (hereinafter Restatement) (limiting the unreasonable exercise of prescriptive jurisdiction with respect to a person or activity having connections with another State); *Murray v. Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible con-

struction remains"); *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817 (1993) (SCALIA, J., dissenting) (identifying rule of construction as derived from the principle of " 'prescriptive comity' ").

This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony—a harmony particularly needed in today's highly interdependent commercial world.

*Id*. at 164-65. Many other decisions from the Supreme Court also reflect the presumption (rebuttable to be sure) against extraterritorial effect. See, *e.g., Small v. United States*, 544 U.S. 385 (2005); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993); *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138 (1957).

While we have no problem with the proposition that the district court was entitled to a reasonable time within which to rule on Hijazi's motion, the fact is that the court has now twice announced in orders that it is deliberately *not* ruling, and in neither instance did the court hint that it had not had enough time to consider the motion. Its reasons, to which we turn later, relate instead to Hijazi's decision not to come to Illinois and its concept of mutuality. What is important is that a ruling on this motion is necessary before the prosecution can proceed, and that there is no prospect of such a ruling ever taking place under the approach the district court has taken.

The government relies on *Hughes* for the proposition that Hijazi does not have a right to a pre-arraignment ruling on his motions. 415 U.S. at 1302 ("Whether the motion should be disposed of prior to the arraignment rests in the sound discretion of the District Court.") *Hughes,* it is worth recalling, was a brief order issued by Justice Douglas sitting in chambers; it is not an opinion of the Court. Moreover, as Hijazi points out, the case reached Justice Douglas at a moment when arraignment was imminent: the matter was scheduled for a hearing "only a little more than an hour from the time in which [he was writing] this short opinion." *Id.* at 1301. The government suggests that this fact is of no importance, because Justice Douglas did not otherwise rely on it. The latter point is correct, but it is equally true that Justice Douglas did not have before him a case that had dragged on for years without a ruling and that presented no prospect of ever being resolved. Permitting a district court to wait a few hours is fundamentally different from denying someone—here, Hijazi—his right ever to have his motions adjudicated. See FED. R. CRIM. P. 12(d). Hijazi's case does not present a simple question of the scope of an accused person's right to a pre-arraignment decision; it involves instead the right of a foreign defendant who did not flee the United States to have a threshold question relating to his duty to appear at all resolved within a reasonable time. A non-fugitive foreign defendant is simply in a different position from that of a domestic defendant seeking more ordinary relief before arraignment. Hijazi's own case is even more deserving of relief since he surrendered himself to the authorities in the

country in which he resides and in which his relevant conduct physically occurred.

In its supplemental brief, the government has relied heavily on the Supreme Court's decision in *United States v. Bowman,* 260 U.S. 94 (1922), to support its interpretation of the extraterritorial reach of the Major Fraud Act. But, as we read it, *Bowman* undermines the government's argument that Hijazi has no right to a ruling. Chief Justice Taft observed at the beginning of his opinion that the case had reached the Supreme Court upon a writ of error "to review the ruling of the District Court sustaining a demurrer of one of the defendants to an indictment for a conspiracy to defraud a corporation . . . ." *Id.* at 95. The case itself raised the question whether a plan hatched on the high seas during a voyage to Rio de Janeiro to defraud the government by ordering 1,000 tons of fuel oil, but delivering only 600, fell within the jurisdiction of the United States. Three of the alleged co-conspirators were U.S. citizens, and the fourth was a British subject. The district court sustained the demurrer to the indictment, on the theory that the statute did not reach crimes committed outside the territorial jurisdiction of the United States and on the high seas. The Court treated the issue before it as one of statutory construction and concluded that Congress did intend to reach the conduct in question. In closing, the Court also made the following observation:

> The three defendants who were found in New York were citizens of the United States, and were certainly subject to such laws as it might pass to protect itself

and its property. Clearly it is no offense to the dignity or right of sovereignty of Brazil to hold them for this crime against the government to which they owe allegiance. The other defendant is a subject of Great Britain. He has never been apprehended, and it will be time enough to consider what, if any, jurisdiction the District Court below has to punish him when he is brought to trial.

*Id.* at 102-03. Given the fact that the entire case involved a review of the district court's decision on the demurrer, this statement is more logically understood as one relating to personal jurisdiction over the British defendant, rather than the legislative jurisdiction issue that the Court had just finished resolving through its interpretation of the statute. *Bowman* does not support the government's argument that a defendant in Hijazi's position has no entitlement to a ruling on the modern equivalent of a demurrer.

Although we express no view about the arguments Hijazi has presented based on the Sixth Amendment's guarantee of a speedy trial, we are of the view that the principles underlying that guarantee point strongly in the direction of Hijazi's right to the ruling he has requested on his motions to dismiss. Both the accused and society as a whole have an interest in prompt resolution of criminal proceedings. See *Barker v. Wingo*, 407 U.S. 514, 519-20 (1972). Indeed, in *Barker* the Court expressed concern that delay could work to the accused's advantage, as witnesses become unavailable and memories fade. Where the defendant bears some responsibility for a delayed trial

date, as in *Vermont v. Brillon*, 129 S.Ct. 1283 (2009), the Court has been willing to tolerate longer periods of time—in *Brillon,* three years, where the defendant ran through six lawyers, at least one of whom he had fired and another who withdrew after the defendant threatened his life. Even though the Court has carefully avoided specifying any particular time that is automatically unreasonable, it has found a Sixth Amendment violation in extreme cases. See, *e.g., Doggett v. United States,* 505 U.S. 647 (1992) (eight years, where defendant for most of the time was living openly in the United States). See also *Klopfer v. United States,* 386 U.S. 213 (1967) (holding that an indictment left pending indefinitely constitutes a Sixth Amendment violation).

Just as a long delay can in some circumstances implicate the constitutional right to a speedy trial, a long delay in ruling on a threshold motion like this one will cross the line at some point. If Hijazi had a legal duty to take an action, and he was behaving in an obstructive way, this case would be different. But nothing that Hijazi has done has in any way prevented the district court from ruling on his motions to dismiss. He filed the motions in a timely fashion; he is represented by first-rate counsel; and he has followed up appropriately rather than allowing matters to languish. More than enough time has passed: Hijazi is entitled to a ruling on his motions now.

3. *Appropriateness of mandamus.* The question remains, as *Cheney* confirms, whether this case is an appropriate candidate for mandamus. We conclude that it is. Hijazi's

arguments raise serious questions about the reach of U.S. law, and it remains to be seen whether the U.S. contacts on which the government relies are sufficient to support its prosecution. Added to those concerns, on which we elaborate in a moment, is the fact that there is reason to believe that this case raises delicate foreign relations issues. This kind of problem is analogous to the separation-of-powers concern that motivated the Court to support mandamus in *Cheney.* See 542 U.S. at 382 (finding that separation-of-powers issues appropriately inform the evaluation of a mandamus petition). As we noted earlier, the Government of Kuwait has formally protested on three occasions the fact that Hijazi is under indictment.

The alleged fraudulent deal that Hijazi and Mazon concocted involved KBR, a U.S. company doing business in Kuwait, and LaNouvelle, a Kuwaiti company. Although it is a fact that KBR was operating under a contract with the U.S. government, it is not clear whether Hijazi knew or cared where KBR's money was coming from. He obviously knew that LaNouvelle was submitting a bid for fuel tankers. It might matter whether Hijazi knew that the tankers were for the use of the U.S. military, but the sketchy record we have thus far does not permit one to draw any conclusions about his knowledge. The government also alleges that Hijazi personally had some direct contacts with the United States. But, upon closer inspection, it turns out that it is referring to the emails that Hijazi (located in Kuwait) sent to Mazon (located in Greece) using email addresses that the government characterizes as "based in the United States" (*e.g.*, Jeff.Mazon@Halliburton.com). At least one

email might have been sent to Mazon after he returned to the United States. Finally, the government argues that Mazon's activities in the United States can and should be attributed to Hijazi. As we pointed out earlier, Mazon attempted to deposit the $1 million that Hijazi had given him in a couple of U.S. financial institutions. This raises its own set of complex issues. Hijazi reminds us in this connection that the government has dropped all fraud charges against Mazon and has accepted a guilty plea for a single misdemeanor count of making a false statement. (It is doubtful that this will have any direct significance for his case; we note that the government would have been entitled to proceed against Hijazi even if Mazon had been acquitted. See *Standefer v. United States*, 447 U.S. 10 (1980).)

Critical to the decision whether these contacts are adequate to support the U.S. proceeding is the question "how much is enough?" The Restatement (Third) of Foreign Relations Law, to which the Supreme Court referred with approval in *Hoffman-La Roche,* see 542 U.S. at 164-65, takes the position that "[s]ubject to § 403, a state has jurisdiction to prescribe law with respect to . . . conduct outside its territory that has or is intended to have substantial effect within its territory." Restatement (Third) of Foreign Relations § 402 (ALI 1987). Section 403 qualifies all of § 402 by stipulating that a state may not exercise prescriptive jurisdiction "when the exercise of such jurisdiction is unreasonable," and it then goes on to specify eight circumstances that might indicate unreasonableness. *Id.* § 403(2). The first of those looks at how strong the link is between the activity and the territory

of the regulating state and calls for consideration of "the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory." *Id.* § 403(2)(a). In *United States v. Nippon Paper Indus. Co.,* 109 F.3d 1 (1st Cir. 1997), the First Circuit applied these principles to a criminal prosecution.

We raise this only to underscore the fact that the outcome of Hijazi's motion is by no means a foregone conclusion, either in favor of the government or in his favor. What is essential is a ruling on that motion. While we considered the question whether this court should rule directly on the merits of the motion, we have concluded that this is not the best way to proceed. As the authorities we have mentioned make clear, there could be facts that the district court needs to explore; the district court is familiar with the developments in Mazon's prosecution; and we are not persuaded that this is an appropriate case in which to cut off the usual method of proceeding.

### III

Before concluding, we must say a word about two points that were addressed in the opinions of the magistrate judge and the district court: the fugitive disentitlement doctrine, and mutuality. The Supreme Court summarized the fugitive disentitlement doctrine in *Molinaro, supra,* as follows:

> No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after

the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction. While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims.

396 U.S. at 366. Although the magistrate judge believed that Hijazi was not entitled to a ruling on his motion because of this doctrine, the district court correctly recognized that it does not apply to Hijazi's situation. With the exception of one brief visit to the United States in 1993, which all agree was unrelated to this case, Hijazi has never been in the country, he has never set foot in Illinois, and he owns no property in the United States. He therefore did not flee from the jurisdiction or from any restraints placed upon him. In fact, when he learned of the indictment, he surrendered himself to the Kuwaiti authorities. Had those authorities been inclined to detain him and then to turn him over to the U.S. prosecutors, they could have done so. Or they could have prosecuted him under Kuwaiti law. This was therefore not a reason to refrain from adjudicating his motion.

The district court, however, did not set the doctrine aside altogether. Instead, it suggested that one of the principal justifications for fugitive disentitlement was "the desire for mutuality in litigation." The idea behind the court's statement is that litigation is a two-way street. So, in Hijazi's case, the court reasoned, if he wants the United States to be bound by a decision dismissing the

indictment, he should be similarly willing to bear the consequences of a decision upholding it. The district court thought that Hijazi had little or nothing to lose from an unfavorable ruling on his motion, and this was its primary reason for refusing to act.

We think that the district court took too narrow a view of the adverse consequences that Hijazi would suffer if he loses on his motion to dismiss. Such a decision would, as he points out, make it very risky for him ever to leave Kuwait, which is not his native country. INTERPOL has a long arm, and any travel outside Kuwait's approximately 6,880 square miles (which makes it just a shade bigger than Connecticut, and smaller than Vermont) would risk apprehension and extradition. Naturally he could never travel to the United States, because the Department of Justice could place a border watch for him (if it has not already done so). A successor government in Kuwait could change its mind about cooperating with the United States. Moreover, the Government of Kuwait, Lebanon, or any other country that does not have an extradition treaty with the United States has discretion to extradite Hijazi if it so chooses. A federal court decision upholding the indictment against Hijazi may make those governments more likely to exercise that discretion and less confident in resisting diplomatic pressure from the United States if they are no longer able to protest that the indictment is legally flawed as a matter of U.S. law.

An analogy to admiralty proceedings illustrates further why the strong version of mutuality that the district court

demanded is not necessary. The admiralty rules permit actions *in rem*. In such cases, if a person chooses to make a general appearance, then the district court will acquire full *in personam* jurisdiction over her. But Admiralty Rule E(8) permits someone facing an *in rem* admiralty or maritime claim to file an appearance that is "expressly restricted to the defense of such claim, and in that event [the appearance] is not an appearance for the purposes of any other claim with respect to which such process is not available or has not been served." More broadly, it was once the case that civil defendants could file a special appearance in which they challenged the court's personal jurisdiction over them, and if that challenge succeeded, they could walk away from the lawsuit. That device is no longer used in general civil proceedings in federal court, because FED. R. CIV. P. 12(b)(2) permits a challenge to personal jurisdiction to be joined with other defenses without waiving the objection to jurisdiction. See *Republic Intern. Corp. v. Amco Engineers, Inc.,* 516 F.2d 161, 165 (9th Cir. 1975); *Grammenos v. Lemos,* 457 F.2d 1067, 1070 (2d Cir. 1972). Some states, however, retain it, see, *e.g.,* TEX. R. CIV. P. 120a, and, as we have noted, a limited version of it lives on in the federal admiralty rules. The principal point here is to note that any special appearance is no different, from a mutuality point of view, from the motions that Hijazi is attempting to have resolved. Indeed, given the adverse consequences we have already identified that Hijazi will experience, he stands to lose more than a civil defendant making an old-fashioned special appearance.

In short, if Hijazi loses his challenge to the indictment, he faces a significant enough threat of prosecution in the

United States to satisfy any mutuality concerns that may exist. Outside of the core fugitive disentitlement context, the Supreme Court has indicated that disentitlement is "too blunt an instrument" to redress the indignity of a defendant's absence. *Degen v. United States,* 517 U.S. 820, 828 (1996). If that is so, then it is similarly true that comparable disentitlement may not be based on a perceived lack of mutuality.

For these reasons, we therefore GRANT Hijazi's petition for a writ of mandamus, and hereby order the district court promptly to rule on his motions to dismiss the indictment.

SO ORDERED.